ADOPTION OF N.P.S., a Minor.

No. S–5481.

Supreme Court of Alaska.

Feb. 18, 1994.

Eric Smith, Anchorage, for appellant Jenny Paul Sims.

Mary Ellen Ashton, Anchorage, for appellee Xavier T. Medley.

No appearance by Toksook Bay Traditional Council, pro se, Toksook Bay, or J.P. Tangen.

U.S. Dept. of the Interior, Anchorage, for Guardian Ad Litem Jennifer Abbott.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

OPINION

RABINOWITZ, Justice.

N.P.S. was born to A.S. on March 9, 1981. The natural father of N.P.S. is unknown. A.S. died on December 2, 1990. Jenny Sims and Xavier Medley both sought to adopt N.P.S. We affirm the superior court's decision to grant the adoption petition of Xavier Medley.

Jenny Sims, the mother of A.S., is a 63–year–old Yup'ik widow who has lived in Toksook Bay all her life. Xavier Medley is a 39–year–old caucasian who resides in Wasilla. He met A.S. and N.P.S. in 1983, and first resided with them in Anchorage. In 1983, A.S. gave birth to a second son, Simon George Sims, whom Jenny culturally adopted as an infant. In 1989 A.S. bought the property in Wasilla where Xavier still resides.

After A.S.'s death in 1990, N.P.S. continued to live in A.S.'s house with Xavier. A.S.'s sister Martina lived in another house on the same property, and Xavier and Martina shared N.P.S.'s care. N.P.S. visited Toksook Bay several times in 1991. On January 17, 1992, Martina took N.P.S. to visit Toksook Bay but never brought him back to Wasilla. While residing in Toksook Bay,

N.P.S. shared a room in Jenny's house with his brother Simon.

On June 15, 1992, A.S.'s holographic will dated October 11, 1990 was admitted to probate in the superior court at Palmer. In re [A.S.], 3PA–91–55– P/A, (Alaska Super.Ct., June 15, 1992). The will expresses A.S.'s desire for N.P.S. to have his own home, and for Xavier Medley to care for him if something should happen to her. It also says she did not want the rest of her family to "take over."

Jenny Sims and Xavier Medley separately filed petitions in the Bethel Superior Court to adopt N.P.S. Superior Court Judge Curda held an evidentiary hearing on August 21, 1992 on the consolidated petitions. Several witnesses testified, and Judge Curda interviewed N.P.S. on the record alone in chambers. Although some of his responses were transcribed as "inaudible," N.P.S. indicated that he would prefer to live with Xavier, despite a desire to be with his brother.

Thereafter, the superior court appointed a guardian ad litem (GAL) to investigate the facts further. Her report found that both Jenny and Xavier "sincerely desire to meet [N.P.S.]'s needs, and are capable of doing so." The GAL also noted that N.P.S. had been classified as learning disabled, and stated her belief that he should be tested for attention deficit disorder.

According to the GAL, "his cultural needs could best be met in the village ... [but] his emotional needs may not be able to be met there." In light of that, and the evidence "to suggest that [N.P.S.]'s mother had a preference as to who, other than herself, should raise him," the GAL recommended that (1) Xavier's petition for adoption of N.P.S. be granted, (2) regular contact between N.P.S. and his family in Toksook Bay be maintained, and (3) N.P.S. be assessed for attention deficit disorder.

After conducting another hearing, the superior court issued an order adopting the recommendations of the GAL. The court ordered that N.P.S. be returned to Xavier Medley by December 28, 1992. The next

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

day, the Toksook Bay Traditional Council (the Council) filed a letter, signed by N.P.S., in which he stated that he wanted to remain in Toksook. He wrote a second letter, however, in which he stated that he wanted to live with both Jenny Sims and Xavier Medley. On December 17, the superior court received letters from the Council and the Toksook Bay Family Service Specialist that stated that N.P.S. did not wish to leave, and that the Council would not force him to leave.

The superior court then asked the GAL to meet with N.P.S. again, to "determine what his placement preference was, and to help facilitate [N.P.S]'s transition." Although the GAL spoke with a number of people involved in the dispute, and with N.P.S. on the telephone once, the GAL was otherwise not allowed to contact N.P.S. The Council informed the GAL that it would not allow N.P.S. to leave Toksook Bay. After the GAL filed a report containing this information, the superior court issued a writ of assistance ordering the return of N.P.S. to Xavier. A state trooper attempted to carry out the order on December 31, 1992, but he encountered some difficulty, and was subsequently authorized by the superior court not to enforce the order.

After several motions by Jenny Sims and the Council urging the superior court to modify its adoption decision, and discussion of the possibility of conducting another hearing in Bethel, the superior court ordered state troopers to transfer N.P.S. to Xavier Medley's custody immediately, and the troopers carried out the order.

Jenny Sims and the Council now bring this appeal. They challenge the superior court's determination that allowing Xavier Medley to adopt N.P.S. is consistent with the federal Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901–1963 (1988), and the superior court's conclusions "that the child consented to live with [Xavier], and that placement of the child with [Xavier] was otherwise consistent with Adoption Rule 9 and AS 25.23.040."

## I. STANDARD OF REVIEW

ICWA governs custody proceedings involving Indian children.[1] A party asking a court to deviate from ICWA's preferences for placement bears the burden of proving, by a preponderance of the evidence, good cause. *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993). We will overturn the superior court's determination regarding adoption placement preference only if the record as a whole shows an abuse of discretion or if the lower court's controlling factual findings are clearly erroneous. *Id.* An abuse of discretion occurs when the superior court gives improper weight to a factor or considers an improper factor. *Id.*

## II. DISPUTED FACTS

Under ICWA,

[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a) (1988). ICWA does not define "good cause." *F.H.*, 851 P.2d at 1364. It does, however, state that "[w]here appropriate, the preference of the Indian child or parent should be considered." 25 U.S.C. § 1915(c). The Bureau of Indian Affairs has issued guidelines that offer examples of the kinds of factors that can provide good cause to deviate:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 § F.3 (1979). The guidelines assist but do not bind this court. *F.H.*, 851 P.2d at 1364.

And the list is not exhaustive. Although ICWA and the guidelines draw attention to important considerations, the best interests of the child remain paramount. *See F.H.*,

---

**1.** The parties do not dispute that N.P.S. is an    "Indian child" within the meaning of ICWA.

851 P.2d at 1363–64; *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785, 791 (1983); *cf.* AS 25.23.005 (state adoption statutes must be liberally construed to promote the best interests of the child). The superior court found good cause based on a number of factors, including N.P.S.'s preference, A.S.'s preference, and N.P.S.'s emotional needs.

## A. The Preference of N.P.S.

■ The superior court found that "[N.P.S.]'s preference is to live with Xavier." N.P.S. indicated such a preference in his meeting alone with the superior court judge in chambers, although he also expressed a wish to stay with his brother, who lived with Jenny. The GAL also reported that N.P.S. would like to live with Xavier, because he is "'the only father I ever knew.'"[2]

Jenny makes several arguments that question the significance of the statements. First, she maintains that N.P.S. expressed a preference for Xavier to the superior court judge in chambers only because the judge's questions were leading. The record does not bear this characterization out. The question the judge asked was "if you could have the choice of where you wanted to be, to live, where would you live?"

Jenny suggests that "N.P.S. apparently feels compelled to give people the answer he believes they want to hear." This theory is plausible, but equally plausible is the possibility that N.P.S. is afraid to tell his grandmother Jenny Sims that he would rather live with Xavier Medley, and Jenny points to no evidence that makes her theory more persuasive than others. The GAL reported that N.P.S. is afraid of his grandmother, but did not indicate that N.P.S. fears Xavier. The superior court was in the best position to evaluate this issue.

Finally, Jenny contends that even if the superior court's determination was reasonable at the time it was made, subsequent events cast doubt on its correctness. N.P.S. wrote two letters: one stated a desire to stay in Toksook, and one stated, "I can only live with one and I wont [sic] to live with both ove [sic] them." These conflicting letters do not render the superior court's determination as to N.P.S.'s preference clearly erroneous.

## B. Maternal Preference

■ Jenny disputes the superior court's finding that A.S. wanted Xavier to raise N.P.S. The only evidence in support of her contention is the affidavit of Pauline Asuluk, the Family Services Specialist for Toksook Bay, which contains the statement that Jenny Sims told the specialist that Jenny and A.S. had made an agreement that if anything happened to either of them, the other would take care of A.S.'s two boys. There is no other record evidence of this agreement.

Assuming this agreement between Jenny Sims and A.S. existed, a conclusion that A.S. subsequently changed her mind would not be clearly erroneous in light of A.S.'s holographic will. In her will, the most recent evidence of her preference, she stated in no uncertain terms that she wanted Xavier Medley to have N.P.S. Twice in her holographic will, A.S. stated that she did not want her family to get close to N.P.S., and warned "if they try [to] take Over—Don't Let Them." Moreover, friends of A.S. informed the GAL that A.S. had told them she wanted Xavier to have custody of N.P.S.[3]

## C. Cultural Needs

■ The superior court found that N.P.S.'s cultural needs would be better served by being with Jenny Sims in Toksook Bay, but that they would be met adequately by a one-month trip every year to Toksook Bay, and visits to an uncle who is currently imprisoned in Palmer. The GAL wrote that

---

**2.** The evidence is not consistent, however. Jenny's brief asserts that "N.P.S. clearly told the Council and his grandmother that he wanted to live with Jenny in Toksook Bay." N.P.S. has expressed conflicting preferences, but there is enough evidence that he wanted to live with Xavier that the superior court's ruling was not clearly erroneous.

**3.** Apparently conceding the strength of A.S.'s preference expressed in her will, Jenny speculates that A.S.'s motivation was the "difficult relationship" between mother and daughter. Even if true, the history behind a preference is less important under ICWA and the guidelines than the preference itself.

exposure to N.P.S.'s cultural heritage "can be accomplished minimally in the Wasilla area. Regular contact with [N.P.S.'s] extended family and time spent in the village would give [N.P.S.] an understanding of the lifestyle of the Yup'ik culture as well as promoting a positive image of himself as an Alaskan Native."

Jenny Sims offers no facts that contradict the court's conclusion regarding Xavier's ability to meet N.P.S.'s cultural needs. Instead, Jenny relies on the court's statement that "[p]lacement with Jenny is more likely to foster cultural values and a positive self image in [N.P.S.] as an Eskimo." Jenny asserts a contradiction between the court's finding that she would be better able than Xavier to meet N.P.S.'s cultural needs and its decision that Xavier's petition for adoption should be granted over her own.

What is called into question by this argument is not so much whether the court erred in finding Xavier to be at least minimally capable of providing for N.P.S.'s . cultural needs, but rather whether the court gave sufficient weight in its overall decision to Jenny's concededly superior ability to provide for N.P.S.'s cultural needs. We address this issue below, in the section of our opinion discussing the weight attached by the trial court to various factors affecting N.P.S.'s best interests. To the extent Jenny challenges the trial court's decision that Xavier is minimally capable of providing for N.P.S.'s cultural needs, we find no clear error.

### D. Emotional Needs

■ The superior court found that adoption by Xavier Medley would better meet N.P.S.'s emotional needs, noting that N.P.S. had lived with Xavier for most of his life. Although the GAL found that both Xavier and Jenny "could appropriately care for [N.P.S.]," she expressed concerns about the effect on N.P.S. of being moved so abruptly from Wasilla to Toksook.

Jenny responds that "an equally strong bond developed between N.P.S. and Jenny and between N.P.S. and his brother during the time that N.P.S. lived in Toksook Bay." Although the record contains considerable evidence that N.P.S. cared for his grand-mother and brother, the superior court's finding that adoption by Xavier would better meet N.P.S.'s emotional needs is not clearly erroneous.

### E. Educational Needs

The superior court noted that N.P.S. appears to have some sort of learning disability, possibly attention deficit disorder. The superior court's only finding on this issue is that "[the GAL's recommendation] was that any treatment would be easier in Wasilla; this court agrees." Jenny does not directly contest this finding. Even if treatment would be available in Toksook Bay, there is no evidence that it would be as easily available as in the Wasilla area.

### III. THE WEIGHT ATTACHED TO THE VARIOUS FACTORS

■ In determining which adoption would serve the best interests of N.P.S., the superior court considered a number of factors.

### A. Maternal Preference

Even assuming that A.S. wanted Xavier to have custody of N.P.S., Jenny argues, the superior court did not weigh that fact appropriately: "Mr. Medley is required to prove, by a preponderance of the evidence, that the preference of A.S. is sufficient to override the statutory preference for placement in a Native home." The superior court judge, according to Jenny, "did not apply this standard—he merely held that it was in fact appropriate to consider A.S.'s desires."

Review of the record persuades us that the superior court gave appropriate weight to A.S.'s preference. Whether one factor outweighs another is committed to the sound discretion of the trial court. Although the superior court apparently gave A.S.'s preference substantial weight, it did not abuse its discretion in doing so.

### B. Cultural Needs

Jenny's arguments concerning the weight attached to cultural needs are unpersuasive. She argues that "to find good cause [to deviate from the preferences mandated by ICWA] in visitation by Native relatives and a

one-month trip to the village would make a mockery of the preference, for such terms could be used *at any time* to deny a Native relative his or her preferential right to adopt a Native child." The superior court found that N.P.S. could maintain contact with his culture even if he lived with Xavier, not that this fact constituted good cause to deviate from the adoptive preferences provided for in ICWA. On the other hand, the superior court concluded that other factors did constitute good cause to deviate, notwithstanding the cultural advantages of N.P.S.'s living with Jenny Sims in Toksook Bay.

What Jenny Sims is really arguing is not that any finding regarding N.P.S.'s cultural needs was "clearly erroneous," but that the court abused its discretion "in determining that there was good cause notwithstanding its own finding" that N.P.S. would learn more about his culture living in Toksook Bay with his grandmother. Given the advantages of living with Xavier Medley discussed above, we conclude that the superior court did not abuse its discretion in concluding that good cause had been shown to deviate from the ICWA preferences in adoption matters.

### C. *Emotional Needs*

"The real question," according to Jenny, "is not which [emotional] bond is more 'important,'" but whether a preponderance of the evidence demonstrates that the bond between Mr. Medley and N.P.S. was so much more significant to N.P.S.'s emotional well-being than that between N.P.S. and Jenny and his brother that there is good cause to override the ICWA preference." The "preponderance of the evidence" language is inappropriate here. It is a distortion to treat the question of N.P.S.'s emotional needs as if it were the only factor in Xavier's favor. In view of the total picture, we find no abuse of discretion.

4. Adoption Rule 9(c) states in part:
**Consent By a Minor.** (1) A consent by a minor child over the age of 10 to the child's adoption must be signed in writing and must be in the presence of the court unless the court in the best interest of the minor dispenses with the minor's consent or the requirement that the child consent in court.

5. That rule provides in part:

### D. *Summary*

The superior court's application of ICWA to this case was entirely proper. None of its factual determinations is clearly erroneous, and it did not abuse its discretion when weighing the various factors, most of which support granting Xavier's petition. Xavier Medley has been a *de facto* father to N.P.S. for almost all of N.P.S.'s life, and that weighs heavily in favor of allowing Xavier to become N.P.S.'s *de jure* father. We are satisfied that the superior court did not err when it found that living with Xavier would be in the best interests of N.P.S.

## IV. CONSENT

Jenny's final argument is that the superior court improperly waived the written consent of N.P.S. to his adoption by Xavier Medley. After finding that "[N.P.S.]'s choice is clear," the superior court stated that in N.P.S.'s best interests it "could dispense with his consent to be adopted." This issue grows out of several statutory provisions and rules. Alaska Statute 25.23.040(5) and Adoption Rule 9(c) [4] both require the written consent of a minor who is at least ten years old before that minor may be adopted. Rule 9(c) requires that the form be signed in the presence of the court. Both allow the court to waive the requirement of written consent in the best interests of the child.

Jenny contends that waiver is not allowed in the case of Native children, citing Adoption Rule 9(b). [5] The purpose of Rule 9(b) is to insure that when written consent is required by some statutory provision (probably AS 25.23.040), such consent must occur in court. This is to afford the court an opportunity to ascertain whether the parties have taken ICWA into account. Here, the record reflects that ICWA has been accorded pains-

**Consent or Relinquishment Involving an Indian Child.** A consent or relinquishment involving an Indian child must be signed in a hearing in the presence of a judge unless the consent is by an agency. In addition to the explanations required by paragraph (d), the court shall inquire as to what efforts have been made to comply with the placement preferences of 25 U.S.C. Section 1915(a).

taking consideration, and so the purpose of Rule 9(b) has been satisfied. Because the superior court properly waived consent in this case, the requirement that consent occur inside of court (rather than elsewhere) is irrelevant.

## V. CONCLUSION

The superior court considered the relevant factors in this case thoroughly and fairly. Its factual determinations were not clearly erroneous, and it does not appear to have attached undue weight to any one factor. Consent was properly waived. We therefore AFFIRM the superior court's grant of Xavier Medley's petition to adopt N.P.S.