v.

P.C.S., Appellee.

In the Matter of the Adoption
of S.K.A., f/k/a S.G.

Nos. S–9478, S–9607.

Supreme Court of Alaska.

Feb. 12, 2001.

**770**

Michael J. Walleri, Law Offices of Michael J. Walleri, Fairbanks, for Appellants C.L. and C.L., and S.K.A.

Daniel L. Callahan, Schendel & Callahan, Fairbanks, for Appellee P.C.S. Brooks W. Chandler, Hicks, Boyd, Chandler & Falconer, Anchorage, for R.K. and J.A.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

L.G.'s parental rights were terminated as to her daughters, J.G. and S.G. The superior court awarded adoption of J.G. to P.S., and awarded adoption of S.G. to R.K. and J.A. The maternal grandparents of the children sought their adoption below, and they challenge various aspects of the adoption proceedings. For the reasons stated below, we affirm the decision of the superior court in all respects.

## II. FACTS AND PROCEEDINGS

J.G., who was born on September 16, 1991, and S.G., who was born on October 1, 1994, are the daughters of mother L.G. The children and their mother are Yupik Natives and tribal members of the Native Village of Emmonak.

C.L. and C.L. are the children's maternal grandparents. Mrs. C.L. is also an Emmonak tribal member and is the biological mother of L.G. Mr. C.L. is a non-Native and is L.G.'s step-father.

L.G.'s parental rights in J.G. and S.G. were terminated on April 28, 1999,[1] after a proceeding before Superior Court Judge Richard D. Savell. We affirmed this termination in a separate opinion, L.G. v. State, Department of Health & Social Services.[2] In that opinion we discussed L.G.'s long history of substance abuse and the evidence that L.G. neglected J.G. and S.G.[3]

J.G. and S.G. have both had multiple homes and care givers. J.G. lived with her mother for her first two and one half years, until the Division of Family and Youth Services (DFYS) took protective custody. Then, for a brief period J.G. lived with her grandparents, C.L. and C.L., until the grandparents returned her to DFYS. J.G. was then placed in three successive, short-term foster homes. Then, J.G. was placed with P.S., a single woman who was later granted adoption of J.G. by the superior court below.

J.G. lived with P.S. for more than a year, until DFYS returned J.G. to her mother's custody. However, J.G. continued to visit P.S. on weekends. J.G. remained in her mother's custody until March 1996, when DFYS took emergency custody of J.G. because of L.G.'s continued substance abuse problems. For five months J.G. lived with R.K. and J.A., who also had custody of S.G. During this period J.G. maintained regular contact with P.S. and spent entire weekends with P.S. After this, J.G. was returned to her mother's custody for about a year, until DFYS once again took emergency custody because of L.G.'s drug abuse. In the next year, J.G. lived in two different foster homes. In July 1998 J.G. returned to the custody of P.S. and has lived with her ever since.

S.G. has had a similarly complicated placement history. S.G. lived with her mother for the first few months of her life, until DFYS took protective custody. After an initial foster home placement, S.G. lived with a Native couple, R.K. and J.A., who were eventually awarded adoption of S.G. by the superior court below. In October 1995 S.G. was returned to her mother's care, although R.K. and J.A. continued to visit, and babysat S.G. on occasion. S.G. remained in her mother's custody until March 1996, when DFYS took emergency custody of S.G., as well as J.G., because of L.G.'s continued substance abuse problems. At this time S.G. was returned to the care of R.K. and J.A. The child lived with them for the next five months. In August

---

[1]. The April 28, 1999 order also terminated the parental rights of J.G.'s biological father, A.D., and S.G.'s biological father, J.H. Both of the fathers abandoned the children.

[2]. 14 P.3d 946 (Alaska 2000).

[3]. See id. at 948–49.

1996 S.G. was returned to her mother's custody for about a year, until DFYS once again took emergency custody because of L.G.'s drug abuse. S.G. then lived in two different foster homes for a year, along with J.G. In July 1998 S.G. returned to the custody of R.K. and J.A. and has lived with them ever since.

The April 28, 1999 termination of L.G.'s parental rights made J.G. and S.G. available for adoption.[4] In the superior court below, Judge Ralph R. Beistline conducted separate adoption proceedings for J.G. and S.G.

On May 17, 1999, P.S., with whom J.G. has lived since July 1998, petitioned to adopt J.G. P.S. is a single, non-Native woman.

On June 8, 1999, grandparents C.L. and C.L. intervened in J.G.'s adoption proceedings, and sought custody of J.G. for themselves.

On August 12, 1999, R.K. and J.A. petitioned to adopt S.G. S.G. currently lives with R.K. and J.A. R.K. is an Emmonak tribal member and is the children's second cousin once removed by marriage. J.A. is also a Yupik Alaska Native and is a tribal member of the village of Kotlik.

On October 12, 1999, C.L. and C.L. intervened in S.G.'s adoption proceeding, seeking custody of S.G. for themselves. They also moved to consolidate the cases of J.G. and S.G.

Judge Beistline denied the motion to consolidate the two cases. After trial, he awarded adoption of J.G. to P.S. and awarded adoption of S.G. to R.K. and J.A. Judge Beistline also awarded P.S. $1,000 in attorney's fees. C.L. and C.L. have appealed these rulings. For purposes of appeal, these cases have been consolidated.

## III. STANDARD OF REVIEW

■ This appeal requires us to review the denial of a motion to consolidate, the denial of a relative's visitation rights, an award of attorney's fees, and an appointment of a guardian ad litem. These decisions are reviewed for abuse of discretion.[5]

■ This appeal also requires us to review the superior court's interpretation of the Indian Child Welfare Act of 1978 (ICWA); this is a question of law that is reviewed de novo.[6] We are also required to review the superior court's finding of good cause to deviate from ICWA placement preferences; we will do so using an abuse of discretion standard.[7] The superior court's factual findings are reviewed using the clearly erroneous standard.[8]

## IV. DISCUSSION

C.L. and C.L. challenge various aspects of the adoptions awarded by the superior court below. In all, five of the superior court's rulings must be considered: (A) the refusal to consolidate the separate cases of J.G. and S.G., (B) the awards of adoption (to P.S. and to R.K. and J.A.), (C) the refusal to award C.L. and C.L. formal visitation rights, (D) the award of partial attorney's fees to P.S., and (E) the appointment of Sonia Mazurek as the guardian ad litem for S.G. For the reasons stated below, we affirm the decisions of the superior court in all respects.

### A. The Superior Court's Decision Not to Consolidate the Cases Was Not an Abuse of Discretion.

■ On October 12, 1999, C.L. and C.L. moved to consolidate the separate adoption proceedings concerning, respectively, J.G. and S.G. The superior court denied this mo-

4. See L.G. v. State, Dep't of Health & Social Servs., 14 P.3d 946 (Alaska 2000).

5. See Virgin v. Virgin, 990 P.2d 1040, 1043 (Alaska 1999) (award of attorney's fees); J.F.E. v. J.A.S., 930 P.2d 409, 411 (Alaska 1996) (denial of visitation rights); Foltz–Nelson Architects v. Kobylk, 749 P.2d 1347, 1349 n. 2 (Alaska 1988) (denial of motion to consolidate); W.E.W. v. D.A.M., 619 P.2d 1023, 1025 (Alaska 1980) (appointment of guardian ad litem).

6. See A.M. v. State, 945 P.2d 296, 304 n. 10 (Alaska 1997).

7. See Adoption of N.P.S., 868 P.2d 934, 936 (Alaska 1994).

8. See id.

tion. We review this decision for abuse of discretion.[9]

C.L. and C.L. argue that the superior court abused its discretion by failing to consolidate the two adoption proceedings. They claim that the issue of whether the sisters would be separated was central to both cases and that "the only way that the court could properly consider sibling bonding" was to consolidate the proceedings.

Under the circumstances of this case, the superior court's decision not to consolidate the cases was not an abuse of discretion. The motion to consolidate was not filed until a month and a half after the trial in J.G.'s adoption case had begun and after a full day of testimony had been received. Denial of the motion did not prejudice C.L. and C.L. because they were free in both cases to present evidence that would tend to show the importance of placing the siblings together. Moreover, the superior court fully considered the importance of keeping the siblings together in its written findings of fact and conclusions of law.

B. *The Superior Court Properly Awarded Adoption to P.S. and to R.K. and J.A.*

After separate trials, the superior court awarded adoption of J.G. to P.S., and awarded adoption of S.G. to R.K. and J.A. C.L. and C.L. challenge these awards.

1. *The superior court properly awarded adoption of J.G. to P.S.*

The superior court awarded adoption of J.G. to P.S. on the basis that good cause

existed to deviate from the ICWA placement preferences.[10]

ICWA does not define good cause,[11] nor does it set forth factors to be considered in determining whether good cause exists. We have previously sought guidance from Bureau of Indian Affairs (BIA) guidelines, which offer the following list of factors to consider:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[12]

■ We have also stated that "[w]hether there is good cause to deviate in a particular case depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe."[13] The best interests of the child remain the paramount criterion.[14]

In awarding adoption of J.G. to P.S., the superior court found good cause to deviate from the ICWA placement preferences under 25 U.S.C. § 1915(a). The court found that adoption by P.S. is in J.G.'s best interests, based on consideration of the following factors: (i) J.G.'s already existing bond with P.S; (ii) J.G.'s desire to be adopted by P.S.; (iii) J.G.'s symptoms of separation anxiety and attachment disorder; (iv) J.G.'s multiple placements in the past; (v) J.G.'s weaker

---

**9.** *See Foltz–Nelson Architects v. Kobylk*, 749 P.2d 1347, 1349 n. 2 (Alaska 1988).

**10.** ICWA demands the following placement preferences:

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a) (1983).

P.S., a non-Native single woman, does not qualify for any of the preference groups under 25 U.S.C. § 1915(a): she is not (1) a member of

J.G.'s extended family, (2) another member of J.G.'s tribe, or (3) Native. Therefore, 25 U.S.C. § 1915(a) demands that there be "good cause" to award adoption of J.G. to P.S.

**11.** *See In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993).

**12.** *N.P.S.*, 868 P.2d at 936 (quoting Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 § F.3 (1979)).

**13.** *F.H.*, 851 P.2d at 1363–64.

**14.** *See N.P.S.*, 868 P.2d at 936.

bond with the grandparents in comparison to her bond with P.S.; (vi) the grandparents' misunderstanding of the harm done to J.G. by exposure to her mother and alcohol; and (vii) J.G.'s cultural needs. We review the lower court's finding of good cause to deviate from ICWA placement preferences for abuse of discretion.[15] We will only reverse the superior court's factual findings if they are clearly erroneous.[16]

The grandparents make two basic arguments in their attempt to show that the superior court abused its discretion in finding good cause to deviate from ICWA placement preferences. They claim that (a) some of the factual findings made by the superior court were clearly erroneous; and (b) the superior court improperly analyzed the relevant factors for good cause.

### a. *The superior court's factual findings were not clearly erroneous.*

C.L. and C.L. challenge a number of the factual findings made by the superior court.

■ First, the grandparents challenge the court's finding that J.G. had symptoms of separation anxiety and attachment disorder. The grandparents claim that this finding was clearly erroneous because there was no diagnosis of J.G. as having either separation anxiety or attachment disorder. However, the superior court did not find that there was a diagnosed condition; it only found that there were *symptoms* of these disorders. This is supported by evidence in the record, in the form of expert testimony concerning J.G.'s symptoms and behavior. We cannot say that this finding was clearly erroneous.

■ Second, the grandparents challenge the court's finding that J.G.'s bond with her grandparents was not as significant as her bond with P.S. There is evidence in the record that supports the grandparents' claim that J.G. has a significant bond with her grandparents; specifically, J.G. asked to see the grandparents on at least one occasion, and J.G. was happy to visit her grandparents. However, there is also evidence in the record that supports the conclusion that J.G.'s bond with her grandparents was not as strong as her bond with P.S. Specifically, there was evidence that the grandparents have had regular but limited contact with J.G., and that J.G. has consistently maintained and expressed her desire to stay with P.S. rather than the grandparents. Moreover, there was expert testimony that P.S. was the only person with whom J.G. had formed an attachment. Because of this evidence, we cannot say that the superior court's finding that J.G.'s bond with her grandparents was not as strong as her bond with P.S. was clearly erroneous.

Third, the grandparents claim that the superior court committed clear error by finding that J.G. and her sister S.G. had no significant bond. However, the superior court made no finding at all on the nature of the bond between the siblings. The superior court did find that the sisters did not bond with the same care giver, but did not find that the sisters lacked a significant bond with each other. There is, however, evidence in the record, in the expert testimony, that J.G. and S.G. were not particularly close to each other. Therefore, there is no clearly erroneous finding here.

■ Lastly, the grandparents challenge as clearly erroneous the superior court's finding that the grandparents "do not completely appreciate the adverse impact that exposure to [L.G.] has on [J.G.] and the adverse impact that exposure to alcohol, even in the slightest amount, has upon [J.G.]." There is adequate evidence in the record to support this finding. With respect to J.G.'s contact with her mother, the grandparents have previously permitted L.G. to see the children on multiple occasions, against the wishes of DFYS and the foster parents, even during the termination proceedings. Despite the harm done by contact between J.G. and her biological mother L.G., Mrs. C.L. testified that she would permit L.G. to see J.G. if L.G. remained clean and sober for a few years.

With respect to the exposure to alcohol, both grandparents testified that they currently drink to the point of "getting a buzz"

15. *See id.* at 934, 936.

16. *See id.*

on occasion. Both grandparents were in the past convicted of driving while intoxicated and attended alcohol treatment programs. Also, there is evidence that Mrs. C.L. drank in front of J.G., and was intoxicated on occasions when social workers called and when J.G. was brought for a scheduled visit. Adequate evidence in the record supports the court's finding that the grandparents do not understand the impact on J.G. of exposure to her mother and to alcohol consumption.

b. *The superior court properly analyzed the appropriate factors for good cause deviation from ICWA adoptive preferences.*

C.L. and C.L. also claim that the superior court improperly analyzed the relevant factors in finding good cause to deviate from ICWA's preferences for adoption by family or tribal members.[17] The grandparents make two separate arguments: (i) that the superior court placed inordinate weight on J.G.'s bond with P.S., ignoring other relevant factors that favored adoption by the grandparents; and (ii) that the BIA guidelines set forth the only factors that the superior court should have considered. These arguments will be discussed in turn.

First, the grandparents argue that the superior court placed inordinate weight on one factor, and failed to consider other factors that "heavily favored" the grandparents as adoptive parents. C.L. and C.L. note that the superior court heavily relied on a factor that favors P.S.—specifically, the strong bond that has developed between P.S. and J.G.[18] The grandparents then claim that the superior .court should have considered other factors—factors that together outweigh the already existing bond·between J.G. and P.S. Specifically, the grandparents claim that the

superior court failed to recognize: (i) the need to raise the sisters together, in one household; (ii) DFYS's failure to consider the grandparents when searching for potential adoptive parents; (iii) the grandparents' particular ability to meet J.G.'s cultural needs as a Native child; and (iv) the fact that J.G. had no "extraordinary" physical or emotional needs that could only be met by her bond with P.S.

However, the superior court did consider these factors, and concluded that, combined with the other factors, the weight of the evidence favored adoption by P.S. The superior court explicitly considered the desirability of keeping the sisters together; however, the court concluded that, because the sisters have not bonded with the same care giver, this consideration is outweighed by other factors.[19] And the grandparents were considered as potential adoptive parents by both the superior court and by social workers involved in the case. Also, the court considered the cultural needs of J.G. and concluded that P.S. has demonstrated a capacity to expose J.G. to Native culture, and that C.L. and C.L. will continue to play a role as grandparents in J.G.'s cultural exposure. Lastly, the court certainly considered the bond between J .G. and P.S. and its relationship to J.G.'s emotional and physical needs.[20] The four factors cited by the grandparents were fully considered by the superior court, and we cannot say that the court's analysis of these factors was an abuse of discretion.

C.L. and C.L. separately argue that the only factors that the superior court should have considered are the factors listed in the Bureau of Indian Affairs Guidelines:

(i) The request of the biological parents or the child when the child is of sufficient age.

---

17. *See* 25 U.S.C. § 1915(a) (1983).

18. Although the grandparents claim that the court relied only on (i) the bond between P.S. and J.G., and (ii) the fact that J.G. had been through multiple placements in reaching its conclusions, the court in fact relied on multiple factors, as discussed above.

19. As the court stated: "[C.L. and C.L.] have expressed a desire to keep [J.G.] together with her sister [S.G.], and adopt both of the girls.

Unfortunately, [J.G.] and [S.G.] have not bonded with the same care giver. As important as it is to keep siblings together, that consideration is outweighed in this matter by the need for consistency and stability in [J.G.]'s life and the need to maintain the only bond that [J.G] has been able to establish in her life."

20. The grandparents argue in part that the court misapplied this factor by deviating from the BIA guidelines. This issue is fully discussed below.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness. (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[21]

The grandparents cite a decision of the Montana Supreme Court, *In re C.H.*,[22] in which that court considered whether there was good cause, in an adoption proceeding, to deviate from ICWA placement preferences. The court in *C.H.* held that, when ICWA applies, the three BIA factors *exclusively* control and that a court may not consider *any* other factors:

> The [BIA] guidelines provide that a determination of good cause to avoid the preferences "shall be based on one or more of" three stated factors.... [We agree] that, in light of the plain language used in the guidelines, the three expressly stated [BIA] factors cannot be interpreted as merely illustrative of the circumstances which may constitute good cause. Rather, they are the only circumstances constituting good cause to avoid the [25 U.S.C.] § 1915(a) adoptive placement preferences. We conclude the District Court erred in determining that the factors set forth in the guidelines and the BIA's related commentary are merely examples, and not an

exhaustive listing, of circumstances which constitute good cause.[23]

The court treated the bond between the child and the prospective adoptive parents as only relevant if it rose to the level of an "extraordinary emotional need," under the second BIA guideline.[24] And the court in *C.H.* held that it was also improper to consider separately the "best interests of the child" because, under ICWA, it is presumed that the child's "best interests" are met by adherence to ICWA and the exclusive BIA guidelines.[25]

■ However, we have rejected the rationale underlying the Montana Supreme Court's decision in *C.H.* We do not agree that the BIA factors are exclusively controlling. In *In re Adoption of F.H.*,[26] we stated that the BIA Guidelines "do not have binding effect," although a court may look to them for guidance.[27] Whether there is good cause to deviate in a particular case depends on many factors including, but not limited to, the BIA guidelines.[28] We recognize that child adoption proceedings are highly context-sensitive, and that different adoption cases will vary factually. As we have stated previously, the best interests of the child must be paramount in these proceedings.[29] Therefore, the superior court did not err by relying on a broad range of factors, including the BIA guidelines, and by primarily stressing J.G.'s best interests.[30]

---

**21.** *N.P.S.*, 868 P.2d at 936 (quoting Guidelines for State Courts, Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 § F.3 (1979)).

**22.** 299 Mont. 62, 997 P.2d 776 (2000).

**23.** *Id.* at 782 (internal citations omitted).

**24.** *Id.* at 783; 44 Fed.Reg. 67,594 (1979).

**25.** *C.H.* at 784.

**26.** 851 P.2d 1361 (Alaska 1993).

**27.** *Id.* at 1364; *see also N.P.S.*, 868 P.2d 934, 936 (Alaska 1994).

**28.** *See In re Adoption of F.H.*, 851 P.2d at 1363–64. *See also L.G.*, 14 P.3d at 954–55. Other courts have also concluded that the BIA guidelines are not binding on courts interpreting ICWA. *See Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 7 P.3d 960, 965 (App.2000) (noting that, "for assistance in interpreting ICWA, a state court *may* rely on the Act's interpretative guide-

lines drafted by the Bureau of Indian Affairs") (emphasis added); *In re Dependency of E.S.*, 92 Wash.App. 762, 964 P.2d 404, 409 (1998) ("The BIA guidelines have no binding legislative effect.... The legislative history of the ICWA indicates that the reason the phrase, "good cause to the contrary" is not defined is to provide state courts with flexibility in determining the disposition of a child custody proceeding involving an Indian child."); *In re Michael G.*, 63 Cal.App.4th 700, 74 Cal.Rptr.2d 642, 651 (1998) (noting that the BIA guidelines remained unpublished because a binding legislative effect was not intended).

**29.** *See N.P.S.*, 868 P.2d at 936.

**30.** This result is also consistent with our recent opinion in *L.G. v. State, Department of Health & Social Services*, 14 P.3d 946 (Alaska 2000), in which we affirmed the termination of L.G.'s parental rights and found that there was good cause to deviate from ICWA pre-adoptive preferences under 25 U.S.C. § 1915(b) to place J.G. with foster mother P.S. In *L.G.*, we affirmed the

2. *The superior court properly awarded adoption of S.G. to R.K. and J.A.*

 The superior court awarded S.G. to R.K. and J.A. on the basis that they had adoption placement preference rights under ICWA, 25 U.S.C. § 1915(a).[31] ICWA applies and is controlling because both S.G. and J.G. qualify as "Indian children" under ICWA. Our review of the superior court's interpretation of ICWA is de novo.[32]

In deciding the issue of S.G.'s adoption, the court considered the adoptive placement preferences demanded by ICWA:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.[33]

The superior court held that *both* the grandparents (C.L. and C.L.) *and* the prospective adoptive parents (R.K. and J.A.) qualified as "members of the child's extended family" under 25 U.S.C. § 1915(a), giving them both equal ICWA placement preference rights. The superior court decided between them on the basis that S .G. had already formed a relationship with, and bonded with, R.K. and J.A., and the same could not be said for C.L. and C.L.

The grandparents claim that the superior court erred in interpreting ICWA so as to make R.K. and J.A. "members of the child's extended family" with ICWA preference rights. However, the superior court did not err in making this determination. The court found that R.K. is S.G.'s second cousin once removed by marriage. Even though this family relationship is distant, the court noted that, under Yupik tradition, kinship relationships can be "activated" by conduct including providing food and shelter. C.L. and C.L. did not counter this with any evidence that R.K. was not a member of S.G.'s extended family. Therefore, the superior court properly found that R.K. and J.A. were extended family members with adoption preference right under ICWA.

 C.L. and C.L. also claim that, given that both parties have equal preference rights under ICWA, the superior court erred by favoring R .K., a distant relative of S.G., over C.L. and C.L., who are closer relatives. The superior court correctly noted that 25 U.S.C. § 1915(a) does not set forth any order of preference among "extended family members" who seek to become prospective adoptive parents. The superior court made its decision based on its assessment of S.G.'s existing relationship with R.K. and J.A. The grandparents claim that, under Yupik tradition, placement with closer relatives is required. However, the grandparents failed to introduce any evidence to support this claim. An expert, Dr. Phyllis Morrow, testified that the majority of Yupik adoptions are by grandparents. But she explicitly refused to state that, under Yupik custom, there is any preference for grandparents over other more distant relatives. Therefore, the superior court properly held that both the grandparents and R.K. and J.A. have preference rights under ICWA. The superior court did not err by choosing between these parties based on its assessment of the best interests of S.G.

C. *The Superior Court Did Not Abuse Its Discretion by Failing to Grant the Grandparents Formal Visitation Rights.*

 C.L. and C.L. argue that, if P.S. was properly awarded adoption of J.G., the grandparents should have been granted formal visitation rights. Although the superior court found that it was in J.G.'s best interests to "maintain her relationship with . . . her grandparents," the superior court did not

---

principle that the best interests of the child are also paramount in making pre-adoptive placement determinations under ICWA. *Id.* at 955.

**31.** The superior court alternately held that even if R.K. and J.A. did not have ICWA preference rights for adoption, there was good cause to deviate from ICWA preferences. Because we

today affirm the holding that R.K. and J.A. had ICWA preference rights, we need not reach the merits of the alternative holding.

**32.** *See A.M. v. State*, 945 P.2d 296, 304 n. 10 (Alaska 1997).

**33.** 25 U.S.C. § 1915(a) (1983).

allow the grandparents formal visitation rights. Rather, the court stated:

> [P.S.] has demonstrated the willingness and ability to maintain these contacts and relationships for the minor child and the Court is confident she will do so in the future. [P.S.] should have the discretion as [J.G's] parent to determine the circumstances and frequency of such contacts as is in her best interests. It is not necessary or in the minor's best interests to enter a specific order regarding visitation in the adoption decree.

We review this decision for abuse of discretion.[34]

Alaska's adoption statutes explicitly permit "visitation between the adopted person and that person's natural parents and other relatives."[35] Visitation rights will not be granted if they do not serve the child's best interests.[36]

In their opposition to P.S.'s proposed findings of fact and conclusions of law, the grandparents requested that the superior court include visitation rights in the adoption decree.

The grandparents claim that leaving visitation to P.S.'s discretion rather than guaranteeing such rights in a formal court order constitutes an abuse of discretion. But they do not challenge the court's findings that P.S. has facilitated such visitations in the past and would continue to do so in the future. The record firmly supports these factual findings. If P.S. does not follow through with these intentions, the grandparents could then petition the court for visitation rights due to a "change in circumstances" in accordance with AS 25.20.065(b)(2). Therefore, we cannot say that the failure to grant the grandparents formal visitation rights was an abuse of discretion.

## D. The Superior Court Did Not Abuse Its Discretion by Awarding Partial Attorney's Fees to P.S.

The grandparents also challenge the superior court's award of attorney's fees to P.S. P.S. requested under Civil Rule 82(b)(2) an attorney's fees award of $1,845, or thirty percent of her $6,150 total fees. Over opposition, the superior court awarded $1,000 in attorney's fees. The grandparents claim that this award is unreasonable because (1) P.S.'s $2,000 federal adoption subsidy covers adoption costs including attorney's fees, and (2) the grandparents' intervention did not increase P.S.'s legal work. We review this award for abuse of discretion.[37]

Even if the grandparents' claim about the subsidy is correct, the award of attorney's fees remains proper. Assuming that P.S. could apply the $2,000 subsidy to attorney's fees,[38] her remaining "actual attorney fees"[39] would still equal $4,150. The $1,000 fee award made by the superior court would still fall well below the thirty percent of actual fees contemplated by Rule 82(b)(2).

The grandparents' claim that their intervention did not increase P.S.'s legal work is not supported by the record. There is instead evidence that their intervention greatly increased the quantity of testimony at the hearing and written work submitted, and therefore increased the legal work required by P.S. Therefore, we cannot say that the award of attorney's fees to P.S. was an abuse of discretion.

## E. The Superior Court Did Not Abuse Its Discretion by Appointing Sonia Mazurek as the Guardian Ad Litem for S.G.

The grandparents also claim that the superior court abused its discretion by ap-

34. See J.F.E. v. J.A.S., 930 P.2d 409, 411 (Alaska 1996).

35. AS 25.23.130. Contrary to the grandparents' argument, AS 25.20.065(a) does not apply to the present case. See AS 25.20.065(b) (stating that "a grandparent may petition under this section. only if (1) the grandparent did not request the court to grant visitation rights during the pendency of [adoption] proceedings under ... AS 25.23").

36. See In re Adoption of A.F.M., 960 P.2d 602, 605–06 (Alaska 1998).

37. See Virgin v. Virgin, 990 P.2d 1040, 1043 (Alaska 1999).

38. The grandparents are probably not correct, because the subsidy is intended to cover costs other than attorney's fees as well.

39. Alaska R.Civ.P. 82(b)(2).

pointing a biased guardian ad litem, Sonia Mazurek, for S.G. We review this decision for abuse of discretion.[40]

The grandparents argue that the court-appointed guardian ad litem Sonia Mazurek was biased. They cite as bias Mazurek's prior guardian ad litem status during the children's children in need of aid cases, her participation in S.G.'s placement with R.K. and J.A., and her purported focus on J.G.'s best interests rather than S.G.'s.[41]

However, these claims of bias are primarily complaints about Mazurek's ultimate recommendations: splitting up the children and placing S.G. with R.K. and J.A. Mazurek's conclusions reflect concern for S.G.'s best interests rather than any bias for R.K. and J.A. or against the grandparents. Specifically, Mazurek in her report concluded that S.G. had bonded to R.K. and J.A. and that it was in S.G.'s best interests to be adopted by that couple. Rather than being biased, Mazurek fulfilled her duty to "exercise [her] best professional judgment on what disposition would further the best interests of the child, [her] client, and at the hearing vigorously advocate that position before the court." [42] There was no abuse of discretion.

## V. CONCLUSION

Because the superior court did not commit any error in (A) declining to consolidate the separate cases of J.G. and S.G., (B) awarding the adoptions of J.G. and S.G. to, respectively, P.S., and R.K. and J.A., (C) refusing to award C.L. and C.L. formal visitation rights, (D) awarding P.S. partial attorney's fees, and (E) appointing Sonia Mazurek as the guardian ad litem for S.G., we AFFIRM the decision of the superior court in all respects.

---

40. *See W.E.W. v. D.A.M.,* 619 P.2d 1023, 1025 (Alaska 1980).

41. The grandparents also argue that Mazurek violated her duty of independent evaluation by substantially relying on DFYS investigations. But the record cited by the grandparents does not reflect that Mazurek relied substantially on DFYS investigations. Instead, DFYS relied on Mazurek.

42. *Veazey v. Veazey,* 560 P.2d 382, 387 (Alaska 1977).