NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ADINA B., | ) |
| | )    Supreme Court No. S-14314 |
|        Appellant, | ) |
| | )    Superior Court No. 3AN-07-00376 CN |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | )    MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES. | )         AND JUDGMENT* |
| | ) |
|        Appellee. | )    No. 1411 - February 15, 2012 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian Ad Litem.

Before: Carpeneti, Chief Justice, Fabe and Winfree, Justices. [Christen and Stowers, Justices, not participating]

## I. INTRODUCTION

A mother challenges the trial court's decision to terminate her parental rights to her son. Because the evidence supports the court's findings and the court correctly applied relevant law, we affirm the termination of her parental rights.

---

\*      Entered pursuant to Appellate Rule 214.

## II. BACKGROUND

Adina and Brett B.'s son, Dustin,[1] was born in 2007 with serious medical problems — he likely will need occupational, physical, and speech therapies and ongoing care throughout the rest of his life. Dustin falls within the definition of an "Indian child"[2] under the Indian Child Welfare Act of 1978[3] (ICWA). The State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) had previously taken custody of the couple's two older children, and took custody of Dustin shortly after he was born. Given the nature of this appeal we do not need to detail OCS's history of involvement with the family, but after unsuccessful reunification efforts OCS petitioned to terminate Adina's and Brett's parental rights to Dustin.

The standards for terminating parental rights are provided in Alaska Child in Need of Aid Rule 18; they are primarily governed by Alaska statutes but also, in the case of an Indian child, include federal requirements under ICWA.[4] After a March 2011 termination trial, the trial court found OCS met its burden of proof for the termination of Adina's and Brett's parental rights.[5] Brett has not appealed; Adina appeals the

---

[1] Pseudonyms are used for all family members.

[2] *See* 25 U.S.C. § 1903(4) (2006).

[3] 25 U.S.C. §§ 1901–1963 (2006). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902 (2006).

[4] CINA Rule 18 (referencing requirements in AS 47.10.011, 47.10.080, and 47.10.086, and providing, in the case of Indian children, protocols that comport with ICWA, 25 U.S.C. § 1912(d) and (f) (2006)).

[5] Under ICWA and relevant Alaska Child in Need of Aid (CINA) statutes
(continued...)

termination of her parental rights, arguing that: (1) OCS failed to make active efforts to keep Dustin with his Native family; and (2) termination of Adina's parental rights was not in Dustin's best interests. But Adina's appeal of the termination order really focuses on a legal issue, as she argues that both the active efforts and the best interests findings are clearly erroneous because OCS failed to comply with ICWA's separate child placement preferences.[6] Adina also appeals the superior court's placement order, issued as a part of the termination order, again arguing failure to comply with the ICWA placement preferences.

## III.   DISCUSSION

---

[5]   (...continued)
and rules, parental rights to an Indian child may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that:

(a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A));

(b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) – (ii)); and

(c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family (CINA Rule 18(c)(2)(B)); and

(2) beyond a reasonable doubt, supported by expert testimony, that an Indian child is likely to suffer serious emotional or physical damage if returned to the parent's custody (CINA Rule 18(c)(4)); and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)).

[6]   ICWA details placement preferences to be given in foster, pre-adoptive, and adoptive placements that focus on maintaining each child's cultural ties to his or her Indian family or tribe. 25 U.S.C. § 1915.

## A.    Termination Of Parental Rights

### 1.    Active efforts

Before terminating parental rights to an Indian child, ICWA requires OCS to prove by clear and convincing evidence that it made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family, and that these efforts were unsuccessful.[7]  The starting point for evaluating OCS's reunification efforts is to "identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[8]  Here, Dustin was concededly a child in need of aid as a result of Adina's substance abuse.  Adina agrees OCS worked closely with her towards reunification,[9] but argues OCS's failure to make "any effort whatsoever" towards securing an alternative placement with Dustin's Native family or community did not comply with ICWA's active efforts requirement.

We recently expressed that OCS's early placement decisions may, in the unusual case, adversely affect a parent's ability to participate in a case plan designed to prevent the breakup of an Indian family.[10]  But we made clear that this was a separate

---

[7]    25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[8]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010) (citing *Burke v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007)).

[9]    Adina does not argue that OCS failed to make active efforts to assist her in remedying her substance abuse.  Indeed, in connection with her "best interests" argument, Adina actually criticizes OCS for focusing too much attention on "its sole, dogged and misplaced reliance on Adina's successful recovery," rather than on finding an ICWA-compliant placement.

[10]    *David S.* ___ P. 3d ___, Op. No. 6647 at 21, 2012 WL 163923, at *10
(continued...)

consideration from whether OCS complied with ICWA's placement preferences.[11] Adina does not argue that a particular placement, or a failure to place, interfered in any way with either OCS's reunification efforts or Adina's ability to participate meaningfully in those reunification efforts. She argues only that active efforts include compliance with ICWA's placement preferences, and thus OCS's failure to comply with those preferences must lead to a finding that OCS failed to make active efforts to reunify Dustin and Adina. *David S.* forecloses Adina's argument as a matter of law, and, in the absence of any other argument, we affirm the trial court's active efforts finding.

### 2. Best interests

If a parent has not remedied the conditions that caused a child to be a child in need of aid and OCS has complied with ICWA's active efforts requirements, OCS may seek termination of parental rights for the purpose of freeing a child for adoption or other permanent placement.[12] But AS 47.10.088(c) and CINA Rule 18(c)(3) require the trial court to consider the best interests of the child in deciding whether to terminate a parent's rights — it is "the best interests of the child, not the parent, that are paramount."[13]

The trial court considered Dustin's special needs for medical care and continued physical, occupational, behavioral, and speech therapies; his progress and development attributed to his foster mother's care; his deep and uninterrupted bond with

---

[10]     (...continued)
(Alaska, Jan. 20, 2012).

[11]     *Id.*

[12]     AS 47.10.088(a).

[13]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011) (citing *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1116 (Alaska 2008)).

his foster mother; and the possible damage to Dustin if his relationship with his foster mother were disrupted. The court also considered that Dustin's foster mother intends to adopt him, that his medical condition requires he have more consistency than most children, and that removal "from the only mother he knows . . . [would] likely cause him regression and problems." Based on these considerations, the trial court found it was in Dustin's best interests to terminate Adina's parental rights.

We have recognized "the fact that a child has bonded with [a] foster parent can be a factor" in a best interests analysis.[14] Similarly, a child's need for permanence and stability may be considered in a termination decision.[15] Notably, both our decisions[16] and the legislature[17] have recognized that children under age six can suffer "significant emotional damage" if they do not have permanency in their lives. The presence or absence of meaningful alternative placement may also be considered in a best interests analysis;[18] however, we have suggested that "lack of permanent placement will not

---

[14] *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008); *see also M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1147 (Alaska 2001) (finding it is within child's "best interests to remain with her foster family because she had bonded to them," rather than biological parent, "whom she had seen three times in one year"); *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1166 (Alaska 2000) (concluding that "[g]iven the significant needs of the children, their attachment to their foster mother, and [the biological father]'s failure to improve his behavior, substantial evidence exists to support the superior court's best interests finding").

[15] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1013 (Alaska 2011) (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850-51 (Alaska 2009)).

[16] *Id.* at 1009.

[17] AS 47.05.065(5).

[18] *Karrie B.*, 181 P.3d at 185 ("[A] court may consider favorable present
(continued...)

necessarily be a decisive factor in deciding whether to terminate parental rights[.]"[19]

Adina argues the trial court should have considered the lack of ICWA-compliant placement options in its best interests analysis, contending OCS "created" the unavailability of ICWA-compliant placements through "its sole, dogged and misplaced reliance on Adina's successful recovery." Adina argues that although she has not remedied her conduct and Dustin would suffer harm if returned to her care now, the unavailability of an ICWA-compliant placement leads to the conclusion that she should have been given more time to remedy her conduct.

In *Jacob W. v. State, Department of Health & Social Services, Office of Children's Services*, an unpublished decision, we considered the best interests of Indian children who were not placed with a Native Alaskan family and for whom OCS had no permanent placement plans.[20] We rejected the parents' argument that ICWA's goal of promoting "the stability and security of Indian tribes and families" weighs against finding that terminating parental rights is in the children's best interests.[21] Instead, we found that ICWA's placement preferences "specifically appl[y] to placement of an Indian child; nothing in ICWA requires consideration of placement options in determining

---

[18]     (...continued)
placements . . . [or] the fact that there are no favorable permanent placement options for a child . . . as a factor in determining whether terminating a parent's rights would be in a child's best interests.").

[19]     *Id.* (discussing *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119 (Alaska 2002), in which this court affirmed termination of father's parental rights in spite of conceded difficulty in finding permanent placement for child and "need for [his] children to be placed immediately in a permanent stable home." *Id.* at 1125.).

[20]     Mem. Op. & J. No. 1319, 2008 WL 5101809 (Alaska, Dec. 3, 2008).

[21]     *Id.* at *9.

whether to terminate parental rights."[22]  We noted the relevant issue was whether the parents' "parental rights should be terminated in the best interests of the children, not what would happen to the children after termination of those parental rights."[23]  We affirmed the trial court's finding that termination was in the children's best interests, despite the lack of a permanent ICWA-compliant placement.[24]

In *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*, we rejected the parent's argument that because the case concerned Indian children, a "more complex evaluation" of the children's best interests was required,[25] including "consideration of the importance of having the child raised within the Indian child's community."[26]  We quoted from *Jacob W.* and reiterated that a challenge to a termination order and a challenge to a placement decision are separate considerations.[27]

We reiterate that OCS's compliance with ICWA placement preferences is not relevant to a best interests analysis.  Given the court's findings regarding permanency, Dustin's special needs, and Adina's history of relapse, Adina's argument that she should have more time to attempt reunification efforts is counter to Dustin's best

---

[22]    *Id.*

[23]    *Id.*

[24]    *Id.*

[25]    244 P.3d 1099, 1120 (Alaska 2010).

[26]    *Id.*

[27]    *Id.* (quoting *Jacob W.*, 2008 WL 5101809, at *9) ("ICWA requires that preference be given — in absence of good cause to the contrary — to members of the child's extended family or to someone otherwise affiliated with the child's Indian tribe. . . . [T]his specifically applies to placement of an Indian child; nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights.")

interests. The trial court's finding that termination of Adina's parental rights was in Dustin's best interests is not clearly erroneous.

## B.     Placement

In its written order terminating Adina's parental rights to Dustin, the superior court found Dustin's current placement with his foster-mother was reasonable in light of the permanent plan for Dustin's adoption by the foster-mother, and promoted his best interests. The court specifically noted that Dustin had been with his foster-mother since leaving the hospital after his birth, that Dustin's medical issues required more consistency than most children, and that removing Dustin from his foster-mother after three years "would be too late and likely cause him regression and problems." In its earlier oral ruling, the superior court also noted the lack of an ICWA-compliant placement on the horizon.

Adina appeals from this implicit placement order, contending the superior court's findings did not constitute good cause to deviate from ICWA's placement preferences. She argues that: (1) OCS's failure to make an ICWA-compliant placement throughout the case and the long period of placement with the foster-mother caused the unavailability of an ICWA-compliant placement at the time her parental rights were terminated; and (2) Dustin's medical issues "should not have been intentionally balanced against his cultural heritage and needs." Adina concludes the superior court's placement order should be reversed with a remand for further proceedings and OCS efforts to find Dustin an ICWA-compliant placement.

ICWA preferences for foster care, pre-adoptive, and adoptive placements of Indian children are mandatory absent "good cause to the contrary."[28] "We review a

---

[28]     25 U.S.C. § 1915(a)-(b). Subsection (b), which is at issue in this case, provides that:

(continued...)

finding of good cause to deviate from ICWA preferences for abuse of discretion."[29]  It is an abuse of discretion for a trial court "to consider improper factors or improperly weigh certain factors in making its determination."[30]

Though ICWA does not define "good cause," the Bureau of Indian Affairs Guidelines offer examples of factors providing good cause to deviate, including "extraordinary physical or emotional needs of the child" and "unavailability of suitable families for placement after a diligent search has been completed for families meeting

---

[28]    (...continued)
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met.  The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child.  In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with –

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

[29]    *In re Adoption of Sara J.*, 123 P.3d 1017, 1021 (Alaska 2005) (citing *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001); *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994)).

[30]    *Id.*, (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000); *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993)).

the preference criteria."[31]  We have in the past held these considerations appropriate,[32] noting that "[a]lthough ICWA and the[se] guidelines draw attention to important considerations, the best interests of the child remain paramount."[33]

We discussed good cause to deviate in *In re Adoption of F.H.*, noting that the determination "depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe."[34]  We have also considered the emotional and psychological damage to the child when removed from a stable and nurturing environment,[35] and favorably noted that courts in other jurisdictions have found that "the certainty of emotional or psychological damage to the child if removed from the primary caretaker may also be considered by the court in determining whether good cause exists to deviate from the placement preferences of . . . ICWA."[36]

---

[31]     Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,594 (1979), *quoted in L.G.*, 14 P.3d at 954-55.  The guidelines "assist but do not bind this court."  *N.P.S.*, 868 P.2d at 936 (citing *F.H.*, 851 P.2d at 1364).

[32]     *See, e.g.*, *Sara J.*, 123 P.3d at 1030 (children's special behavioral and educational needs could not be met in village; special needs could be met by foster parent's training and better access to treatment programs); *L.G.*, 14 P.3d at 955 ("[E]xperts agreed that removing [the child] from her placement with [her foster mother] was certain to cause her serious emotional or psychological damage.").

[33]     *N.P.S.*, 868 P.2d at 936 (citing *F.H.*, 851 P.2d at 1363-64; *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); AS 25.23.005 (state adoption statutes must be liberally construed to promote the best interests of the child)).

[34]     851 P.2d at 1363-64.

[35]     *Sara J.*, 123 P.3d at 1029.

[36]     *L.G.*, 14 P.3d at 955 (quoting *People ex rel. A.N.W.*, 976 P.2d 365, 369 (Colo. App. 1999); also citing *In re Baby Doe*, 902 P.2d 477, 487 (Idaho 1995))

(continued...)

OCS notified the tribe of the proceedings in December 2007, shortly after taking custody of Dustin, but the tribe did not get involved until June 2010. Dustin's maternal grandmother initially refused to take custody and no other family placement options were identified. In October 2007 OCS asked the grandmother about potential family placements, and the grandmother explained no one in Adina's Native family would take Dustin.

OCS sought an Alaska Native medical foster home, but could not locate one to care for such a medically fragile infant. Because OCS was unable to find such a home, it placed Dustin with a non-Native foster mother who had training to meet his special needs.

In January 2008 OCS discussed Native placement options for Dustin with Adina and she provided the name of a family friend in Tok. The family friend declined, as she did not believe she could meet Dustin's medical needs. OCS asked Adina about other possible placements, but Adina only referred OCS to her attorney, who did not respond. In September 2009 OCS asked the State's licensing unit to locate an ICWA-compliant home that could meet Dustin's medical needs, but the unit determined no such home was available. After Adina returned to jail in 2010, she and the Tribe provided OCS the names of seven families they thought might be interested in caring for Dustin. OCS contacted each of them, but none resulted in a placement option.[37]

The trial court's findings must be viewed against that backdrop. The trial

---

[36]    (...continued)
(alteration in original).

[37]    One relative had a criminal history, making him ineligible to care for Dustin. Two other relatives were unwilling to care for Dustin. Four family friends were also unwilling to care for Dustin. Several of them indicated they were not interested due to Dustin's medical issues and because he had been placed with his foster parent for so long, transition to a new home could be detrimental.

court's findings recognized "the significant value of being brought up in one's culture" and the need for cultural involvement, but "both the length of time . . . and [Dustin's] medical needs overweigh those considerations, as well as the fact that there is no placement on the horizon that might even be a possibility for Dustin. To continue to look for a placement . . . would be an experiment that, if it failed, would have disastrous results to [Dustin] . . . ."

Because the trial court relied on proper factors and gave sufficient weight to Dustin's cultural needs, it was not an abuse of discretion to determine that this case presented good cause to deviate from ICWA's placement preferences.

## IV.    CONCLUSION

We AFFIRM the trial court's termination of Adina's parental rights.