*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF TUNUNAK, | ) | |
| | ) | Supreme Court No. S-14562 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-00259 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6788 – June 21, 2013 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances:  James J. Davis, Jr. and Sydney Tarzwell, Alaska Legal Services Corporation, Anchorage, for Appellant.  Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.  Heather Kendall-Miller and Erin C. Dougherty, Native American Rights Fund, Anchorage, for Amicus Curiae Native Village of Kotzebue.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

# I.    INTRODUCTION

The Indian Child Welfare Act (ICWA)[1] establishes adoptive placement preferences for placing an Indian child with a member of the child's extended family, with other members of the child's tribe, or with other Indian families.[2] A court may deviate from these preferences only upon a showing of good cause.[3] ICWA does not state what standard of proof applies to the good cause determination, nor does it state what factors a court must consider in determining whether there is good cause to deviate from the preferences.

In this child in need of aid (CINA) case, the Office of Children's Services (OCS) placed a Native child in a non-Native foster home while working with her mother towards reunification.[4] Over two years later, the superior court terminated the parents' parental rights. The child's maternal grandmother and tribe sought to enforce ICWA's placement preferences. Meanwhile, the child's foster parents petitioned for adoption. The superior court found that there was good cause to deviate from the ICWA adoptive placement preferences and that the grandmother was not a suitable placement for the child.

---

[1]    25 U.S.C. § 1901 *et seq.* (2006).

[2]    25 U.S.C. § 1915 provides in part:

(a) Adoptive placements; preferences

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

[3]    *Id.*

[4]    *See id.* § 1915(b).

The tribe appeals, arguing: (1) the superior court applied the wrong standard of proof to the good cause determination; (2) some of the superior court's findings were not supported by sufficient evidence; and (3) the findings were not sufficient to support the court's good cause determination.

This appeal requires us to reexamine policies that underlie ICWA. Though we have previously held that the preponderance of the evidence standard set forth in Adoption Rule 11 applies, upon closer review we conclude that ICWA implicitly mandates that good cause to deviate from ICWA's adoptive placement preferences be proved by clear and convincing evidence. To the extent our prior cases hold otherwise, they are overruled. We therefore vacate the superior court's decision and remand for further proceedings in which the superior court shall apply the clear and convincing standard of proof to the good cause determination. We do not reach all the issues raised on appeal because we are remanding, but we address some of the tribe's arguments regarding the good cause determination to provide guidance to the superior court and the parties on remand. We also clarify the analysis necessary when a party challenges the suitability of a preferred placement.

## II. FACTS AND PROCEEDINGS

### A. Termination Of Parental Rights

Dawn F.[5] is an Indian child as defined by ICWA.[6] OCS assumed custody of Dawn when she was approximately four months old. The superior court found that she was a child in need of aid pursuant to AS 47.10.011(9) (neglect), (10) (substance abuse), and (11) (mental health issues), and ultimately terminated the parental rights of

---

[5]    Pseudonyms are used for the daughter, the mother, the grandmother, and the foster/adoptive parents to respect their privacy.

[6]    *See* 25 U.S.C. § 1903(4).

both of her parents. Dawn's parents did not appeal the termination of their parental rights.

**B.    Pre-Termination Placement**

ICWA provides that when selecting foster care, preadoptive placement, or adoptive placement for an Indian child, preference must be given to a member of the child's extended family unless there is "good cause" to deviate from this placement preference.[7] OCS assumed custody of Dawn in July 2008 and placed her in emergency foster care in Anchorage. Native Village of Tununak ("the Tribe") intervened in Dawn's CINA case and submitted a list of potential placement options for Dawn, including placement with her maternal grandmother, Elise F., who lives in the village. Elise and a representative from the Tribe met with OCS in July and September to discuss placement options for Dawn, and a tribal ICWA social worker contacted OCS in September to inquire about efforts to place Dawn with Elise.

Elise was ruled out as a viable placement option at that time: an adult son living in her home had been convicted of driving under the influence in 2005, and there was a bench warrant out for his arrest because he had failed to complete an alcohol safety program as required by his sentence. OCS concluded that his conviction constituted a barrier-crime for placement purposes. Other family members also were ruled out for various reasons, including criminal and child protective histories. OCS placed Dawn in a non-Native foster home in Anchorage to facilitate visitation with her mother, Jenn F., who lived in Anchorage.

In November 2008 the parties stipulated that there was good cause to deviate from ICWA placement preferences while a search for preferred placements

---

[7]    *Id*. at § 1915(a)-(b). The statute also specifies other preferred placements that are not at issue in this case. *See id*.

continued. In March 2009 the superior court found there was good cause to continue deviating from ICWA placement preferences and allow Dawn to remain in Anchorage to facilitate visitation with Jenn, who was making "great progress towards reunification" at that time. The guardian ad litem later testified that moving Dawn away from Jenn would have effectively terminated their relationship, given Dawn's young age. Grandmother Elise testified that she did not pursue placement at that time because she hoped Dawn and Jenn would be reunited.

In August 2009 Elise contacted OCS to report that her son had moved out of her home and to confirm that she was still interested in placement. In October 2009 an ICWA social worker for the Association of Village Council Presidents (Village Council Presidents or AVCP) asked OCS to do a "walk through" of Elise's home. At a six-month conference in November 2009, an OCS social worker noted that Elise was able to take Dawn and wanted permanent placement. In December 2009 a representative from the Village Council Presidents visited Elise's home on OCS's behalf and completed a Foster Home Visit Worksheet as part of the foster-care licensing process. The report noted a number of potential hazards in the home that needed to be addressed before placement could occur, including unsecured fuel, guns, medicine, and cleaning supplies, as well as plastic bags and "clutter" in Dawn's potential bedroom. In February 2010 OCS discussed these concerns with Elise, and she said that she planned to address them. OCS asked Elise to arrange for a second home visit once these tasks had been completed.

Meanwhile, in October 2009 OCS placed Dawn with Kim and Harry Smith, another non-Native foster home in Anchorage, because Dawn's previous foster parents could not provide the high level of attention she required. At that time Dawn was easily upset, difficult to soothe, and prone to tantrums and emotional outbursts. Physical and occupational therapy was recommended for Dawn because at ten months of age she tested in the five-to-six-month range for language and motor skills. According to an

OCS social worker, the Smiths' home was very calm and quiet, and they were able to give Dawn the one-on-one attention that she needed.

In December 2009 Elise visited Anchorage, and Kim arranged for her to visit with Dawn. Kim gave Elise her address and phone number, asked her to keep in contact, and asked her to send a photograph of herself to Dawn. Kim sent a Christmas card to Elise with photographs of Dawn. Elise did not call or write, and Kim was not able to reach her at the phone numbers she had provided.

In January 2010 the Village Council Presidents contacted OCS to ask about the status of Dawn's potential placement with Elise. An OCS social worker explained that OCS had conducted a home visit and Elise had confirmed that she needed to clear out a room for Dawn. The social worker also stated it was her "understanding that [Elise] is holding off on having [Dawn] placed with her at this point, because that would prevent [Jenn] visiting with [Dawn]."

In May 2010 Elise attended a visit with Jenn and Dawn. She told an OCS social worker that she did not want placement at that time because she thought Jenn would complete treatment and regain custody of her daughter. At a conference in May an OCS social worker noted that Elise had asked for placement throughout the history of the case, but the home study had found that Elise's house was "very unsafe" and she still had not cleaned it up six months later.

In November 2010 the superior court denied a petition to terminate Jenn's parental rights, finding OCS had not made active efforts to provide remedial services and rehabilitative programs.[8] The court again found good cause to continue to deviate from ICWA placement preferences for Dawn's foster care because "any preferred placements

_____

[8]     *See id.* § 1912(d).

would be well outside the Anchorage area and would make visitation much more difficult."

At a status hearing in February 2011 Elise asked if Dawn would be returned to her mother. The superior court explained that it was not safe for Dawn to return to her mother's custody, given Jenn's continuing mental health and drug use issues. Despite Jenn's lack of progress, neither Elise nor the Tribe challenged Dawn's continued placement in Anchorage at that time.

## C.    Post-Termination Challenges To Placement

In April 2011 OCS filed another petition to terminate Jenn's parental rights, and in September 2011 the superior court terminated her parental rights and freed Dawn for adoption. At that point the Tribe argued there no longer was good cause to deviate from ICWA placement preferences. The court stated it was troubled by the fact that it was unclear whether OCS had pursued any of the Tribe's proposed placements for Dawn, and that an OCS social worker had testified she had not spoken with the Tribe's ICWA representative since being assigned to Dawn's case. The court deferred determining whether there was good cause to deviate from ICWA placement preferences and ordered OCS to submit a report on the availability of ICWA placements.

On October 19, 2011, OCS submitted a report to the superior court listing the Tribe's proposed placements and the reasons why those placements were not viable options. According to the report, most of the individuals had criminal or child protective histories, OCS was unable to locate contact information for some individuals, and others never responded to OCS's inquiries. As to Elise, the report stated: "[Elise F.] completed a homestudy and did not pass the homestudy or complete[] the issues that came out of the homestudy . . . ."

On October 21 the Tribe formally objected to Dawn's placement in Anchorage with an oral objection at a status conference. On November 7 the Tribe filed

a motion to show cause against OCS, alleging the placement report falsely stated that an OCS social worker had conducted a home study for Elise and that OCS had failed to correct the report even though OCS was aware that it contained inaccurate information. OCS responded, explaining that a Village Council Presidents' representative had conducted a foster home study on OCS's behalf, and notes from a subsequent meeting incorrectly stated that an OCS social worker had completed the home study. OCS explained that a foster home study includes an evaluation of the physical condition of the home, background checks, and a brief reference, whereas a home study for adoptive purposes is much more thorough.

On November 3, in the midst of this dispute, the Smiths filed a petition to adopt Dawn. Their petition was stayed pending the resolution of the ICWA placement hearing. The superior court held a placement hearing on November 14.

## D.    Placement Hearing

### 1.    Opening statement of Kathleen Wilson, the guardian ad litem

Kathleen Wilson, the guardian ad litem, stated that she believed it would be in Dawn's best interest to remain with the Smiths because Dawn was three-and-a-half years old at that point and needed permanency. Wilson noted that placement with Elise would be a long process, because: (1) OCS would have to complete a full home study, which could take up to 50 days; (2) OCS would have to work with Elise to gradually establish a bond with Dawn before the child could be moved to her grandmother's home; and (3) Dawn would then have to live with Elise for six months before Elise could formally adopt her. Wilson believed that there was good cause to deviate from ICWA placement preferences, given Dawn's need for permanency, her existing bond with the Smiths, the lack of a bond with Elise, and the length of time it would take for her to achieve permanency if placed with Elise. However, Wilson did not identify any particular reason why Elise would not be a suitable placement for Dawn; her

recommendation was based primarily on Dawn's need for permanency and the fact that Dawn was happy and stable with the Smiths.

### 2. Testimony of Molly Hayes, expert in child development

Molly Hayes, a school counselor with degrees in school counseling and early childhood special education, testified as an expert in child development. She worked with Dawn when Dawn was approximately one year old. Hayes testified that before Dawn moved in with the Smiths, she was easily upset and required more attention and consistency in her routine than other children her age. Dawn had since bonded with the Smiths and the behavioral issues that she exhibited in her previous foster home had diminished. Hayes expressed concern about attempting to transition Dawn away from the Smiths, especially since Dawn viewed the Smiths as her mother and father. But Hayes also testified that she did not know anything about Elise or her home and could not say with certainty that moving Dawn would create an immediate risk to her well-being. Hayes also explained that "split feather syndrome" is a condition that can affect Native children who grow up in a white society and feel they do not belong to either culture, and that this condition can lead to substance abuse and suicide in young adulthood.

### 3. Testimony of Sarah Wood, OCS supervisor

Sarah Wood, an OCS supervisor, testified that she talked to Elise about Dawn's placement in February 2010, and Elise told her that she had not completed the recommendations for making her home safe but planned to address those concerns. Wood explained that an OCS social worker had not visited Elise's home because OCS has a difficult time maintaining staffing in its rural offices and sometimes has to partner with tribal ICWA workers to perform home visits, which is what happened in this case. Wood testified that if the foster home report had concluded that Elise's home was ready for placement, then OCS would have performed a background check on every adult in

the home and would have placed Dawn with Elise if the background checks were clear. Wood explained that if Dawn had been placed with Elise for foster care, a more extensive home study would have been completed prior to adoption.

### 4. Testimony of Talia Robinson, OCS case worker

Talia Robinson, Dawn's OCS case worker, explained that it typically takes 18 months to two years for a child to achieve permanency, but Dawn had been in OCS custody for over three years. Robinson believed it was in Dawn's best interests to be adopted by the Smiths because she had stability there and it was the only home she had ever known.

Robinson also testified about Dawn's placement history. According to Robinson, moving Dawn away from Anchorage before Jenn's parental rights were terminated would have harmed reunification efforts. Dawn was not initially placed with Elise because of her son's criminal history. OCS arranged for a home visit in August 2009 when Elise reported that her son had moved out, but in May 2010 Elise told Robinson that she did not want placement because she wanted Jenn to be reunited with Dawn. Robinson expressed concern that Elise had known about the home visit safety recommendations for a long time, but as recently as November 2, 2011, Elise told Robinson that her home was still not ready for Dawn. Robinson explained that OCS does not send workers to help a potential foster parent make her home physically safe because it is important for the person to show that she is truly interested in placement and demonstrate that she is able to provide for the child's safety on her own.

Robinson further testified that driving under the influence is a barrier-crime for only five years; therefore, Elise's son's 2005 conviction was no longer a barrier to placement as of the November 2011 placement hearing. Robinson also testified that Elise, her husband, and her son did not have any other criminal or child protective

history that OCS was aware of, and that Dawn did not have any special needs that could not be met by Elise in the village.

### 5. Testimony of Cheryl Offt, ICWA director for the AVCP

Cheryl Offt, the ICWA department director for the Village Council Presidents, spoke on behalf of the Tribe. Offt testified that the Tribe had consistently asked OCS to place Dawn with her relatives, specifically with Elise. She explained that the Tribe did not formally object to placement before the termination of Jenn's parental rights because "we always believe in reunification first when it looks possible." Offt testified that too often a tribe will agree to allow a child to stay with non-Native foster parents in one of the urban hubs of Alaska, even though there are ICWA-preferred placements available in a village, in order to facilitate contact with the parents. But, she testified, when the case moves towards termination, OCS claims the child has been with the foster parents for too long and cannot be moved.

Although Offt had never met Dawn, she believed it was important for Yup'ik children to be placed in their culture because:

> Yup'ik elders say that you are . . . not born Yup'ik, you are raised to become Yup'ik and . . . to become Yup'ik, you have to be raised within the context of the Yup'ik culture, . . . you cannot become Yup'ik by taking a class in Yup'ik language. You cannot become Yup'ik by going to dance class. You cannot become Yup'ik by going to the museum. Being Yup'ik, being raised to become Yup'ik, is a lifelong process that involves things that are much deeper, activities, sayings, being given a Yup'ik name and knowing who gave it to you and what it means, knowing who you are related to, not just biologically but through that Yup'ik name. . . . [I]t's a way of being in this world, being with other people, being within your environment.

Offt said that if Dawn were raised by a non-Yup'ik family, she would grow up to be a person who had Yup'ik heritage but did not know what it really meant to be Yup'ik.

Offt believed this could be problematic once Dawn reached adolescence. Offt testified that the Tribe believed it would be in Dawn's best interest to be placed in her grandmother's home, where she would be raised by family within her Yup'ik culture. Offt did not think that maintaining contact with relatives while being raised by the Smiths would be sufficient to keep Dawn connected to her culture. Offt also stated that "there are no overwhelming reasons for [Dawn] not to be in Tununak with family," because the potential hazards identified by the home visit report were "fixable hazards" and "normal things that are in every home in every village out there," and the Tribe was willing to work with OCS to ease Dawn's transition to the village.

### 6. Testimony of Elise F., maternal grandmother

Elise testified that at 67 years old, she was perfectly healthy and capable of caring for her granddaughter. She testified that she lived an active lifestyle by participating in subsistence fishing, berry picking, carrying water, and doing household chores. She had raised eight children herself and helped care for five other grandchildren living in the village. Her husband was 70 and had recently been treated for lung cancer, but the cancer was in remission. Elise testified that there was nothing unusual about grandparents raising a grandchild in the village — her 72-year-old neighbor was still healthy and taking care of a granddaughter. Elise also testified that if she were eventually unable to care for Dawn, one of her daughters who lived in the village and worked as a health aide at the clinic had agreed to take care of her.[9]

---

[9] There was some dispute about this daughter's history. Robinson testified that Elise's daughter had been convicted of assault, a barrier-crime. Elise testified that her daughter and a niece both had the same name — her niece lived in Bethel and had been charged with assault, while her daughter lived in the village and did not have a criminal history. The superior court found Elise's testimony credible on this point.

Regarding placement, Elise testified that she had previously worked as an ICWA worker, she knew that Native children were supposed to be placed with Native families, and she had wanted Dawn to be placed with her from the beginning. When asked if she wanted to take care of Dawn just because the Tribe was asking her to do so, Elise replied, "Yes and no." Elise testified: "[I]t is my right to adopt or take my granddaughter and . . . raise her as an Alaska Native . . . because she is part of my flesh and blood and so that she could learn her values in Native culture and traditions and where she came from."

Elise understood that her son's criminal history and the potential hazards in her home were obstacles to placement and explained that she did not immediately address those issues because she hoped Dawn would be reunited with Jenn. Elise acknowledged that as recently as November 2, 2011, she had told an OCS social worker that her house was not ready for Dawn. But she testified that she had obtained a place to store fuel outside of the house, had stored guns in the attic where children could not reach them, was in the process of clearing out Dawn's potential room, and planned to get a padlock to secure the medicine and cleaning supplies under the bathroom sink. Elise also explained that she often bought extra supplies and food when she was in Anchorage because supplies were so expensive in the village, and the boxes were stacked around the house because they did not have extra cabinet space. She said, "[Y]ou could call it a clutter but that's our food." Elise also testified that her son lived in her home again and helped out with chores, such as carrying water, shopping, cooking, and subsistence hunting. According to Elise, her son could not afford to return to Anchorage to complete the required alcohol treatment program, but he did not drink anymore and alcohol was not available in the village.

Elise also testified about her relationship with Dawn. She said that she was not able to see Dawn very often because it was so expensive to travel from Tununak to

Anchorage. She explained that she did not call or write letters to Dawn because the child was too young to read or communicate, and she had hoped that the Smiths and OCS would contact her to keep her informed about Dawn. She did not send photographs because she did not have a camera, although she could have borrowed one from the local school. Elise acknowledged that Dawn did not know her and that she would have to visit Dawn in Anchorage so they could gradually get to know each other. And she understood that she would have to gradually introduce Dawn to her lifestyle in the village so the child did not experience culture shock. When asked if she thought that it was really in Dawn's best interests to be moved from the Smiths at this point, Elise acknowledged, "That's a difficult question to ask."

### 7. Testimony of Kim and Harry Smith, foster parents

Kim Smith testified that Dawn had been placed in the Smith home for over two years at the time of the trial, and called Kim and Harry mommy and daddy. She testified that Dawn did not speak very much when she was first placed in their home, but was attending speech therapy and had developed a large vocabulary. Kim testified that Dawn was calm and happy when she had stability and a routine, but still would throw tantrums when her routine was disrupted. She testified that Dawn sometimes had bad mornings and would refuse to get out of bed, but she was so tuned in to Dawn's needs that she knew when to pick her up and hug her and when to step outside until Dawn called for her.

Kim testified that she had attempted to expose Dawn to her Native heritage by taking her to a play group for Native children, a Yup'ik dance group, the Native Youth Olympics, the Native Heritage Center, and an Indian education program through the Anchorage School District where Dawn participates in games, crafts, and Yup'ik language instruction.

Kim testified that she and Harry wanted Dawn to have a relationship with her grandmother and were saving money so they could take Dawn to visit Tununak and participate in some of the village activities. Kim stated they also would like Dawn to have a relationship with her half-brother and half-sister and had tried to arrange visits for the siblings whenever they were in Anchorage. And although Jenn had previously said she would not have any contact with her daughter if the Smiths adopted her, Kim testified that she hoped Jenn would want to have a relationship with Dawn in the future.

Kim believed it would be best for Dawn to remain with her and Harry to "maintain the stability and the calmness that have helped her become this amazing little girl." She also thought it would be in Dawn's best interests if her birth family would help the Smiths teach Dawn about her culture and develop connections with her without taking away the people she considers her mom and dad.

Harry Smith briefly testified that he and Kim loved Dawn and wanted to adopt her. He also testified that the Smiths had many Native friends and their church community is very diverse.

### E. The Superior Court's Placement Order

At the conclusion of the placement hearing the superior court acknowledged this was a very difficult case. In December 2011 the superior court issued a written order concluding there was good cause under 25 U.S.C. § 1915(a) to deviate from the ICWA adoptive placement preferences. Accordingly, the court denied the Tribe's objections to adoptive placement and cleared the way for the Smiths to adopt Dawn.

In discussing the facts, the court observed that Elise was 67 years old and would be 82 when Dawn turns 18, and that her husband was 70 years old. The court found Elise's testimony that she wanted to adopt Dawn "less than convincing," because Elise had testified she wanted to adopt Dawn because the Tribe wanted her to, had

maintained almost no contact with Dawn, and knew almost nothing about Dawn's life. The court also found OCS caseworker Robinson's testimony credible that in May 2010 Elise told Robinson she did not want placement because she hoped Jenn would regain custody of Dawn. And the court found that Elise had remedied some but not all of the safety issues identified by the foster home visit.

The court found that the Smiths had been "exceptional foster parents" and were "the only family that [Dawn] has ever known." The court found that in the Smith home, Dawn had "developed from a non-speaking, emotionally upset child into a relatively well adjusted and loving member of their family," because the Smiths had "provided [Dawn] with the consistency and routine that she needs." The court noted that the Smiths had attempted to keep Dawn in touch with her Native heritage, but agreed with Offt's testimony that "these contacts are not the same thing as living with a Yup'ik family in a Yup'ik village."

The court stated that OCS's expert witness Hayes had testified it would be "extremely traumatic" for Dawn to undergo another change in placement, particularly to an unfamiliar village setting. The court found that adoptive placement with Elise would require a full home study and lengthy transition period, and stated the guardian ad litem had testified that this lack of permanency would be "extremely detrimental to [Dawn's] development."

In determining whether, based on these facts, there was good cause to deviate from ICWA placement preferences, the superior court first ruled that OCS had the burden to prove good cause by a preponderance of the evidence in accordance with Alaska Adoption Rule 11(f), rejecting the Tribe's argument that OCS must prove good cause by clear and convincing evidence under AS 47.14.100(e). The court then considered the best interests of the child and the factors listed in the ICWA interpretive guidelines issued by the Bureau of Indian Affairs (BIA).

The court acknowledged the "very real concerns about how [Dawn] will adjust emotionally to growing up with a white family" and recognized that Dawn would "face the risks and stresses associated with negotiating two cultural identi[t]ies." But the court stated it was faced with the choice of exposing Dawn to "possible psychiatric damage in the future" and causing "*certain* psychiatric damage now," (emphasis in original) based on the evidence that Dawn had already been relocated several times, had benefitted from remaining with the Smiths for an extended period of time, and needed permanence in order to maintain her emotional health.

The court also ruled that it had "no doubt" that continued placement with the Smiths was in Dawn's best interests. The court reasoned that "[a] placement change at this point would be very traumatic particularly given the child's reactive attachment disorder symptoms." The court also reasoned that the Smiths were the only family Dawn knew and had provided "extraordinary" care and stability, whereas Elise was a stranger to Dawn.

The court further ruled that Elise was not a suitable placement for Dawn. The court focused on Elise's age, finding it "highly unlikely that Elise and [her husband] will both be alive for the minority of the child." Although Elise had testified she was in good health, the court stated it "does not believe that a 67 year old woman and a 70 year old suffering from cancer can keep up with and provide appropriate care for a three year old child." The court also found Elise's backup plan of having her daughter care for Dawn lacked credibility because the daughter did not testify, so the court had no assurances that the alternate plan was viable.

For these reasons, the superior court concluded that Dawn's best interests "dictate continued adoptive placement . . . with the Smiths" and, therefore, there was good cause to deviate from the ICWA adoptive placement preferences.

## F.    Adoption

The Tribe moved to stay the Smiths' adoption proceeding pending the Tribe's appeal of the superior court's placement ruling to this court. The superior court denied the Tribe's motion. On March 6, 2012, the court held an adoption hearing and granted the Smiths' adoption petition.[10] Dawn is now four years old and has lived with the Smiths for over three years.

## III.    STANDARD OF REVIEW

We review the superior court's finding of good cause to deviate from ICWA adoptive placement preferences for an abuse of discretion.[11]  "It would be an abuse of discretion for a superior court to consider improper factors or improperly weigh certain factors in making its determination."[12] We review the factual findings supporting the superior court's good cause determination for clear error.[13]  A finding is clearly erroneous when we are "left with a definite and firm conviction that the trial court has made a mistake."[14]  Determining whether the superior court's findings comply with

---

[10]    The Tribe also appealed the grant of the Smiths' adoption petition. On November 29, 2012, we issued an order sua sponte staying the adoption appeal pending the resolution of this appeal. Alaska Supreme Court Order in No. S-14670 (Nov. 29, 2012).

[11]    *In re Adoption of Sara J.*, 123 P.3d 1017, 1021 (Alaska 2005).

[12]    *Id*.

[13]    *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994).

[14]    *In re Adoption of Sara J.*, 123 P.3d at 1021 (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)) (quotation marks omitted).

ICWA requirements is a question of law that we review de novo.[15]  Matters of statutory interpretation are also questions of law to which we apply our independent judgment.[16]

## IV.    DISCUSSION

### A.    Overview Of The Indian Child Welfare Act

An overview of ICWA provides context for today's decision.  Congress enacted ICWA after almost a decade-long investigation into the treatment of Indian children in child custody proceedings.  Senate hearings in 1974 and 1977 chronicled "[t]he wholesale removal of Indian children from their homes" by state and private welfare agencies and the placement of those children in non-Indian foster and adoptive homes.[17]  Congress heard testimony describing this disproportionate removal as "the most tragic aspect of Indian life today."[18]  Studies presented at the Senate hearings revealed that 25 to 35 percent of all Indian children had been separated from their families and placed in adoptive families, foster care, or institutions.[19]  The studies also showed that only one percent of the Indian children removed from Indian families were removed on the grounds of "physical abuse," while the "remaining 99 percent of the

---

[15]      *Id*.

[16]      *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 858 (Alaska 2003).

[17]      *Indian Child Welfare Act: Hearings on S. 1214 Before the Senate Select Comm. on Indian Affairs*, 95th Cong., 1st Sess. (1977) [hereinafter *1977 Hearings*]; *Indian Child Welfare Program: Hearings Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs*, 93d Cong., 2d Sess. (1974) (statement of William Byler) [hereinafter *1974 hearings*].

[18]      *1974 Hearings*, *supra* note 17, at 3 (statement of William Byler).

[19]      *1974 Hearings*, *supra* note 17, at 15; *see also* H.R.Rep. No. 95-1386, at 9 (1978) [hereinafter *House Report*], *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531.

cases were argued on such vague grounds as 'neglect' or 'social deprivation' and on allegations of the emotional damage the children were subjected to by living with their parents."[20]

Prior to the passage of ICWA, state courts "had been recognized as possessing broad, seemingly exclusive, jurisdiction over domestic relations and custody of their children — at least outside of Indian country."[21] But in passing ICWA, Congress recognized its own "responsibility for the protection and preservation of Indian tribes and their resources."[22] Congress further found:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and

---

[20] *House Report*, *supra* note 19, at 10, *reprinted in* 1978 U.S.C.C.A.N. at 7532.

[21] Roger A. Tellinghuisen, *The Indian Child Welfare Act of 1978: A Practical Guide with (Limited) Commentary*, 34 S.D. L. REV. 660, 660 (1989).

[22] 25 U.S.C. § 1901(2) (2006).

social standards prevailing in Indian communities and families.[23]

Accordingly, in ICWA Congress declared that "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."[24] Congress attempted to achieve this policy "by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes."[25] These federal standards must be applied by state courts and are intended to "reflect the unique values of Indian culture."[26]

The adoptive placement preferences in 25 U.S.C. § 1915(a) are examples of these "minimum Federal standards."[27] Section 1915(a), described by the United States Supreme Court as "[t]he most important substantive requirement [of ICWA Title 1] imposed on state courts,"[28] "establish[es] a Federal policy that, where possible, an Indian child should remain in the Indian community, but is not to be read as precluding the placement of an Indian child with a non-Indian family."[29] The placement preferences, like ICWA's other procedural and substantive requirements, "seek[] to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in

---

[23]     *Id.* § 1901(3)-(5).

[24]     *Id.* § 1902.

[25]     *Id.*

[26]     *Id.*

[27]     *Id.*

[28]     *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989).

[29]     *House Report*, *supra* note 19, at 23, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

retaining its children in its society."[30]  They also help insure "that Indian child welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' "[31]

The Tribe argues on appeal that AS 47.14.100(e) requires superior courts to find good cause to deviate from ICWA placement preferences by clear and convincing evidence.  OCS argues, and the superior court agreed, that the lower preponderance of the evidence standard under Adoption Rule 11(f) applies.  Native Village of Kotzebue (Kotzebue), participating as an amicus curiae, argues that ICWA § 1915 mandates the clear and convincing standard for departing from ICWA's placement preferences in adoption cases, and that we should overrule our precedent holding otherwise.

The Tribe also challenges the superior court's good cause determination, arguing that ICWA presumes it is in a Native child's best interests to be placed with a Native relative, and that the superior court's factual findings in this case are not supported by sufficient evidence and are insufficient to overcome this presumption.

B.   Standard Of Proof

1.   **Adoptive placements under Adoption Rule 11(f) and 25 U.S.C.§ 1915(a) versus foster care and preadoptive placements under AS 47.14.100(e) and 25 U.S.C. § 1915(b)**

ICWA establishes standards of proof for some determinations, but it does not specify a standard of proof for establishing good cause to deviate from adoptive or

---

[30]   *Holyfield*, 490 U.S. at 37 (quoting *House Report*, *supra* note 19, at 23, *reprinted in* 1978 U.S.C.C.A.N. at 7546)).

[31]   *Id.* (quoting *House Report*, *supra* note 19, at 24, *reprinted in* 1978 U.S.C.C.A.N. at 7546).

foster placement preferences.[32]  For example, when a child is removed from her parents, ICWA requires a showing of "clear and convincing evidence" that the parents' continued custody would likely cause serious emotional or physical harm to the child.[33]  And when terminating parental rights, ICWA requires a similar showing but raises the burden of proof to "beyond a reasonable doubt."[34]

In Alaska, a state statute and a court rule establish different standards of proof for good cause determinations, depending on whether the placement is for foster care or adoption.  Alaska Statute 47.14.100 describes the powers and duties that the Department of Health and Social Services (the Department) has over all children committed to its custody.[35]  Subsection (a) provides that "the department shall arrange for the care of every child committed to its custody by placing the child in a foster home or in the care of an agency or institution . . . ."[36]  Subsection (e) provides:  "When a child is removed from a parent's home, the department shall place the child, in the absence of *clear and convincing evidence* of good cause to the contrary, . . . with, in the following order of preference, (A) an adult family member . . . ."[37]  This statutory provision applies generally, not just to the placement of Native children.

---

[32]    *See* 25 U.S.C. § 1915(a)-(b) (2006).

[33]    *Id*. § 1912(e).

[34]    *Id*. § 1912(f).

[35]    *See* AS 47.14.990(6) (defining "department" as the Department of Health and Social Services).

[36]    AS 47.14.100(a).

[37]    AS 47.14.100(e)(3) (emphasis added).  The statute also specifies other placement preferences that are not at issue here.  *Id*.

Adoption Rule 11, a rule promulgated by the Alaska Supreme Court, applies to adoption proceedings under title 25, chapter 23 of the Alaska Statutes.[38] Subsection (f) specifically addresses good cause for deviating from ICWA placement preferences: "In an adoption involving an Indian child, the burden of proof is . . . on the petitioner to show by a *preponderance of the evidence* that the placement is within the placement preferences or that there is good cause for allowing a non-preferred placement pursuant to 25 U.S.C. Section 1915."[39]

### a. Adoption Rule 11 applies to this adoptive placement determination.

The Tribe argues, as it did before the superior court, that this case involves a foster care or preadoptive placement under ICWA § 1915(b) rather than an adoptive placement under ICWA § 1915(a); thus, according to the Tribe, the good cause determination is governed by the clear and convincing standard under AS 47.14.100(e), and not by the preponderance of the evidence standard under Adoption Rule 11(f). The superior court rejected this argument and found that Adoption Rule 11(f) applies to this case.

We have previously recognized that Adoption Rule 11(f) provides the proper standard of proof for establishing good cause to deviate from ICWA's adoptive placement preferences.[40] But the Tribe points out that all of these prior cases were

---

[38]     Alaska Adpt. R. 1(b) ("Scope.  These rules govern practice and procedure in the trial courts in all phases of adoption proceedings brought under AS 25.23.010 through 25.23.240.").

[39]     Alaska Adpt. R. 11(f) (emphasis added).

[40]     *In re Adoption of Sara J.*, 123 P.3d 1017, 1025 (Alaska 2005) (citing Adoption Rule 11(f)) ("[U]nder Alaska law, the burden of showing good cause is on the party proposing placement outside the statutory preferences."); *Adoption of N.P.S.*, 868 (continued...)

adoption proceedings, and argues that Adoption Rule 11(f) does not apply here because "the present case is not an adoption case." OCS argues that the placement determination in this CINA case "ripened into an adoptive placement [under ICWA § 1915(a)] governed by Adoption Rule 11(f)" once the superior court terminated parental rights and the Smiths filed an adoption petition. OCS relies on *C.L. v. P.C.S.* as a factually similar case in which a foster care placement ripened into an adoptive placement after the superior court terminated parental rights and the foster parents filed adoption petitions.[41]

According to the Adoption Rules themselves, the rules apply to "all phases of adoption proceedings brought under AS 25.23.010 through 25.23.240."[42] In *C.L.*, the superior court conducted separate adoption proceedings for two siblings after terminating parental rights and issued final adoption decrees.[43] In contrast, the placement hearing here was not an adoption hearing under title 25, chapter 23 of the Alaska Statutes;

---

[40](...continued)
P.2d 934, 936 (Alaska 1994) (citing *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993)) ("A party asking a court to deviate from ICWA's preferences for placement bears the burden of proving, by a preponderance of the evidence, good cause."); *In re Adoption of F.H.*, 851 P.2d at 1363 (citing Adoption Rule 11(f)) ("The question on appeal is whether the superior court erred in concluding that good cause existed to deviate from the adoptive placement preferences mandate under ICWA . . . . Under state law, the Hartleys have the burden of proof by a preponderance of the evidence that there is good cause for allowing a non-preferred placement.").

[41]    17 P.3d 769, 772 (Alaska 2001); *see also In re Adoption of Bernard A.*, 77 P.3d 4, 8 (Alaska 2003) ("[A]n initial foster care placement of a very young child in need of aid may ripen into an adoptive placement precisely because of the need for continuity of care. For this reason, we encourage trial courts to expedite and dispose of adoption contests as soon as possible.") (internal citations omitted).

[42]    Alaska Adpt. R. 1(b).

[43]    17 P.3d at 772.

although the Smiths filed an adoption petition, the superior court expressly declined to consolidate that adoption proceeding with this CINA case.

But even though the placement determination took place in the context of a CINA proceeding, it is clear that the parties were essentially contesting — and the superior court was essentially determining — adoptive placement for Dawn. When the court declined to consolidate the two cases, it stated that the future adoption proceeding would be dependent on the placement ruling in the CINA case:

> [T]he Tribe doesn't get two bites at the apple . . . . If the Tribe wins here on this issue, obviously, there's not going to be an adoption and there's . . . going to be a new placement so the adoption will go away. If the Tribe loses, it doesn't get to contest placement in the adoption proceeding because they're basically the same two standards and collateral estoppel would apply and then the adoption would go forward . . . .

The parties' testimony at the placement hearing focused on Dawn's need for permanency and Elise's suitability as an adoptive placement. And the superior court stated in its placement order that it was denying the Tribe's objections to adoptive placement and clearing the way for the Smiths to adopt Dawn.

The superior court correctly relied on the Adoption Rules for the applicable standard of proof; the parties were contesting adoptive placement even though the challenge arose in the context of a CINA proceeding. As such, this case is an adoptive placement governed by Adoption Rule 11(f) and 25 U.S.C. § 1915(a) rather than a foster care or preadoptive placement governed by § 1915(b).

### b. Alaska Statute 47.14.100(e) does not apply to adoptive placement determinations.

In addition to arguing that Adoption Rule 11(f) does not apply in this case, the Tribe also argues that AS 47.14.100(e) "applies to all OCS placement decisions,

including placements for adoptive purposes." Again, AS 47.14.100(e) requires placement with a family member unless there is clear and convincing evidence to deviate from this placement preference.[44] We have previously stated that AS 47.14.100(e) applies only to foster care determinations, not adoptive determinations.[45] But that conclusion was based on a provision in AS 47.14.100(f) that stated "[n]othing in this subsection or in (e) of this section applies to child placement for adoptive purposes."[46] The legislature removed this restriction in 2005.[47] The Tribe argues that the plain language of the statute and the legislative history of the 2005 amendment show that the legislature intended for AS 47.14.100(e) to apply to all placements, including adoptive placements.

When interpreting statutes, we consider "the meaning of the statute's language, its legislative history, and its purpose."[48] The Tribe first argues that the plain language of AS 47.14.100(e) does not limit the clear and convincing standard to foster care placements, but "describes the proper analysis for all cases where a child has been removed from her home, not just at the instant she is initially removed from that home, and not just in cases where the parents still retain their parental rights." Although the Tribe is correct that subsection (e) does not expressly limit its application to foster care

---

[44]    The placement preferences under AS 47.14.100 are very similar to ICWA's foster care and preadoptive placement preferences. *Compare* AS 47.14.100(e)(3), *with* 25 U.S.C. § 1915(b) (2006).

[45]    *In re Adoption of L.E.K.M.*, 70 P.3d 1097, 1101 (Alaska 2003).

[46]    *See* Ch. 59, § 47, SLA 1996.

[47]    Ch. 64, § 35, SLA 2005.

[48]    *Nelson v. Municipality of Anchorage*, 267 P.3d 636, 639 (Alaska 2011) (citing *Grimm v. Wagoner*, 7 P.3d 423, 427 (Alaska 2003)).

placements, the context of the statute and the broader statutory scheme strongly suggest that AS 47.14.100(e) specifically applies to foster care placement.

The statute states: "Subject to (e) . . . of this section, the department shall arrange for the care of every child committed to its custody by placing the child in a foster home . . . ."[49] Subsection (e) then provides that "[w]hen a child is removed from a parent's home," the department must follow certain placement preferences.[50] When read together, these provisions indicate that the statute governs placement preferences when a child is removed from a parent's home *and placed in a foster home*. Additionally, adoptive placement preferences are specifically addressed in other statutes,[51] further indicating that AS 47.14.100(e) does not apply to adoptive placements.

The Tribe mainly relies on legislative history to argue that the 2005 legislature intended to expand AS 47.14.100(e) to apply to adoptive placement by removing the restriction in AS 47.14.100(f) against applying subsection (e) to adoptive placements. Kotzebue supports this argument. The Tribe and Kotzebue rely on remarks made by a legislative aide and a representative from the Department of Law, but they misconstrue the comments that these individuals made to the legislature.

---

[49] AS 47.14.100(a).

[50] AS 47.14.100(e).

[51] *See* AS 47.10.088(i) ("Before identifying a placement of the child in an adoptive home, the department shall attempt to locate all living adult family members of the child . . . . If an adult family member of the child requests that the department approve the adult family member for an adoption, the department shall approve the request unless there is good cause not to approve the adoption."); AS 25.23.127 ("[U]nless the court finds that a petition to adopt the child by an adult family member is contrary to the best interest of the child, the court shall grant a petition to adopt a child by an adult family member who has had physical custody of the child for at least 12 consecutive months before the parental rights to the child have been terminated.").

The Tribe and Kotzebue first cite the minutes for a hearing before the Senate Health, Education, and Social Services Standing Committee. The minutes summarize statements by Rynnevia Moss, a legislative aide to Representative John Coghill, explaining

> [A]nother aspect of the bill was to strengthen families by seeing that extended family members and family friends are to be first and foremost in the consideration of preference to adopt children in need of aid[] (CINA). The bill gives an affirmative responsibility in rejecting the placement of children in the homes of their extended family, friends and a licensed foster home respectively.[52]

The Tribe claims this statement shows that "the effect [of the amendment to AS 47.14.100(f)] would be to ensure that extended family members would be considered first and foremost for the adoption of children in need of aid." But an audio recording of the hearing shows that Moss actually said the bill would "strengthen families" and "make sure that it is family members or family friends who are looked at first *for placement of children that are taken into state custody*."[53] She then stated the bill "also has a provision in section three that says if parental rights are terminated *and there is a family member already raising that child*, there should be a preference for adoption with that family member."[54] Section three of the proposed bill enacted AS 25.23.127, which expressly established an adoptive preference for relatives who had physical custody of

---

[52] Minutes, Sen. Health, Educ. & Soc. Servs. Standing Comm. Hearing on H.B. 53, 24th Leg., 1st Sess., at 2:58:29 (May 2, 2005) (comments of Rynnevia Moss, Legislative Aide to Representative John Coghill).

[53] Comments of Rynnevia Moss, Legislative Aide to Representative John Coghill at 02:58:40–02:58:52, Hearing on H.B. 53 Before the Sen. Health, Educ. & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (May 2, 2005) (emphasis added).

[54] *Id*. at 02:58.55–02:59:11 (emphasis added).

the child for at least one year before the termination of parental rights.[55]  Moss was not discussing the amendment to AS 47.14.100(f) when she referred to adoptive preferences.

The Tribe and Kotzebue also claim that Moss stated the bill ensured "OCS could not approve an adoption by a non-relative if a relative requested adoption."  And they assert Dianne Olsen, a representative from the Department of Law, "echoed" Moss's statements by explaining that "there previously had been a prohibition on making a preference for blood relatives for adoption[,] although there was a preference for foster care alone, and what this section does is provide for . . . adoption as well."[56]  But Moss and Olsen were discussing proposed amendments to AS 47.10.088, which provided that the Department could not approve an adoption by a non-family member if a relative requested adoption unless the Department determined that adoption by the family member was not in the child's best interests.[57]  Again, the comments that the Tribe and

---

[55]    Ch. 64, § 3, SLA 2005 (codified at AS 25.23.127).  The statute provides: "[U]nless the court finds that a petition to adopt the child by an adult family member is contrary to the best interest of the child, the court shall grant a petition to adopt a child by an adult family member who has had physical custody of the child for at least 12 consecutive months before the parental rights to the child have been terminated."

[56]    Comments of Dianne Olsen, Chief Assistant, Attorney General's Office, Dep't of Law at 04:14:45–04:15:35, Hearing on H.B. 53 Before the H. Health, Educ. & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005).

[57]    *See* Comments of Rynnevia Moss, Legislative Aide to Representative John Coghill at 04:13:14– 04:13:26, Hearing on H.B. 53 Before the H. Health, Educ. & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005) (discussing Section 14 of the proposed bill); Comments of Dianne Olsen, Chief Assistant, Attorney General's Office, Dep't of Law at 04:14:45–04:15:35, Hearing on H.B. 53 Before the H. Health, Education & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005) (discussing Section 15 of the proposed bill); *see also* Proposed Committee Substitute for Sponsor Substitute for House Bill (CSSSHB) 53, Version 24-LS0251\L, §§ 14, 15 (March 14, 2005) (showing Section 14 of the proposed bill amended AS 47.10.088(i)
(continued...)

Kotzebue rely on were not describing or referring to AS 47.14.100.

In fact, when Moss did discuss proposed amendments to AS 47.14.100(e) she stated, "[W]hat we're trying to get to here is that a child cannot be placed *in a foster home* if a family member or a friend has requested placement of the child."[58] Her comments do not support the Tribe's argument that the legislature intended to expand the foster care placement preferences under subsection (e) by amending subsection (f). Instead, the legislative history shows that the legislature addressed adoptive placement preferences in other statutes, specifically AS 25.23.127 and AS 47.10.088.

### 2. ICWA mandates a clear and convincing standard of proof for § 1915(a) good cause determinations.

Kotzebue argues that ICWA § 1915 mandates a clear and convincing

---

[57](...continued) and section 15 amended AS 47.10.088(*l*)).

[58] Comments of Rynnevia Moss, Legislative Aide to Representative John Coghill at 04:58:15–04:59:00, Hearing on H.B. 53 Before the H. Health, Education & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005) (discussing Section 33 of the proposed bill) (emphasis added); *see also* CSSSHB 53, Version 24-LS0251\L, § 15 (March 14, 2005) (showing Section 33 of the proposed bill amended AS 47.14.100(e)). When discussing the proposed amendment to AS 47.14.100(f), Moss also stated the amendment:

> provides that if a child is placed in a home other than the home of a relative, the department must fully disclose to the relative the nature of the placement. And I think there's some language in there that provides that if the person has difficulty understanding English then it would have to be explained to them in their native language.

Comments of Rynnevia Moss, Legislative Aide to Representative John Coghill at 04:59:40–04:59:59, Hearing on H.B. 53 Before the H. Health, Education & Soc. Servs. Standing Comm., 24th Leg., 1st Sess. (March 15, 2005) (discussing Section 34 of the proposed bill); *see also* CSSSHB 53, Version 24-LS0251\L, § 15 (March 14, 2005) (showing Section 34 of the proposed bill amended AS 47.14.100(f)).

standard for departing from ICWA's adoptive placement preferences. Kotzebue asserts that "the legislative intent behind ICWA, public policy, and the heightened burdens of proof required throughout other sections of the Act support a finding that the appropriate standard to be applied in adoption proceedings is 'clear and convincing.' "

This is the first case to challenge directly the preponderance of the evidence standard of proof as it applies to adoptive placements under Adoption Rule 11(f); our prior decisions relied on Adoption Rule 11(f) without substantive analysis in determining that the preponderance of the evidence standard applies to ICWA good cause determinations.[59] In *In re Adoption of Sara J.*, we cited Adoption Rule 11(f) in noting that "[u]nder Alaska law, the burden of showing good cause is on the party proposing placement outside the statutory preferences."[60] We similarly cited Adoption Rule 11(f) in *In re Adoption of F.H.* to hold that "[u]nder state law, the [moving parties] have the burden of proof by a preponderance of the evidence that there is good cause for allowing a non-preferred placement."[61] And in *Adoption of N.P.S.* we relied on *In re Adoption of F.H.* for the proposition that "[a] party asking a court to deviate from ICWA's preferences for placement bears the burden of proving, by a preponderance of the

---

[59] *See* Christine D. Bakeis, *The Indian Child Welfare Act of 1978: Violating Personal Rights for the Sake of the Tribe*, 10 NOTRE DAME J.L. ETHICS & PUB. POL'Y 543, 580 (1996) (describing *In re Custody of S.E.G.*, 507 N.W.2d 872, 878 (Minn. App. 1993) as "[t]he only case to squarely address" the proper standard of proof for good cause determinations, and citing *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994) for the proposition that "other jurisdictions have, without discussing their reasons for so doing, applied the preponderance of the evidence standard to a 'good cause' finding").

[60] 123 P.3d 1017, 1025 (Alaska 2005).

[61] 851 P.2d 1361, 1363 (Alaska 1993).

evidence, good cause."[62]

Regardless of the relative absence of in-depth analysis in our prior decisions addressing the appropriate standard of proof, these decisions clearly established that the preponderance of the evidence standard, as embodied in Adoption Rule 11(f), applies to good cause determinations under § 1915(a). We must therefore determine whether the adoption of a heightened standard of proof — which would necessarily overrule precedent — is justified under our well-established jurisprudence regarding the doctrine of stare decisis.[63] "In recognizing the importance of this doctrine, we have consistently held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling."[64] We will overrule a prior decision only if clearly convinced that (1) a decision was originally erroneous or is no longer sound because of changed conditions; and (2) more good than harm would result from overruling it.[65]

Where Congress does not indicate the proper standard of proof, our task "is one of discerning congressional intent."[66] Ordinarily, legislative "silence is inconsistent

---

[62]     868 P.2d at 936 (citing *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993)).

[63]     *See, e.g.*, *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004).

[64]     *Id.*

[65]     *Kinegak v. State, Dep't of Corr.*, 129 P.3d 887, 889 (Alaska 2006); *see State v. Fremgen*, 914 P.2d 1244, 1245 (Alaska 1996) ("Stare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands.") (alterations omitted).

[66]     *Steadman v. S. E. C.*, 450 U.S. 91, 106 n.10 (1981).

with the view that Congress intended to require a special, heightened standard of proof."[67] But we do not believe that Congress, by its silence, intended to apply the preponderance of the evidence standard to good cause determinations.[68] In passing ICWA, Congress declared "that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . . ."[69] Given this purpose, we decline to infer the appropriate standard of proof on the basis of Congress's silence alone without further examining Congress's intent.[70]

Upon closer review, we are convinced by the purposes and policies that drove the enactment of ICWA that it implicitly mandates a clear and convincing standard of proof for deviation from the adoptive placement preferences. With the passage of

---

[67]    *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[68]    In an unpublished decision, the Arizona Court of Appeals interpreted Congress's silence to indicate that Congress did not intend the "clear and convincing evidence" standard of proof to apply to good cause determinations: "Congress did not expressly establish a heightened standard of proof with regard to deviation from the placement preferences in § 1915, and presumably would have done so if clear and convincing evidence were required." *Robert T. v. Ariz. Dep't of Econ. Sec.*, No. 2 CA-JV 2010-0074, 2010 WL 5422605, at *3 (Ariz. App. Dec. 21, 2010). The Arizona court cited our decision in *In re Adoption of F.H.* for the proposition that the preponderance of the evidence standard applies to good cause determinations. *Id.* (citing *In re Adoption of F.H.*, 851 P.2d at 1363). We again note that this is the first time we have considered the appropriate standard of proof for good cause determinations in any detail, and that our conclusion in *In re Adoption of F.H.* did not benefit from the depth of argument and briefing that has occurred in this case.

[69]    25 U.S.C. § 1902 (2006).

[70]    *See In re Custody of S.E.G.*, 507 N.W.2d 872, 878 (Minn. App. 1993), *rev'd on other grounds*, 521 N.W.2d 357 (Minn. 1994) ("We believe it is unreasonable to assume that Congress, by its silence, intended to apply the preponderance of the evidence standard when determining whether 'good cause' exists to deviate from the adoption placement preferences in the Act.").

ICWA, Congress made clear its intent to eradicate the unwarranted removal of Indian children from their communities.[71]  Congress expressly noted the role of state courts in perpetuating this problem and sought to rein in state court discretion through the passage of mandatory federal standards, amongst which is § 1915(a).[72]  As the Tribe persuasively argues, "the lower the standard of proof a court applies to the good cause analysis, the wider this exception becomes, and the easier it is for child welfare agencies to circumvent ICWA's goals by placing Native children in non-Native, non-relative homes."  Given the legislative history of ICWA and Congress's strong emphasis on maintaining Indian families and tribes, we do not believe that the preponderance of the evidence standard sufficiently ensures that courts will properly consider ICWA's policy mandates in making § 1915(a) good cause determinations.

The U.S. Supreme Court's decision in *Mississippi Band of Choctaw Indians v. Holyfield* also compels our conclusion that ICWA § 1915(a) requires a heightened standard of proof.[73]  The Mississippi Supreme Court had relied on state law to interpret the term "domicile" and hold that a tribal court did not have jurisdiction over the adoption of two Indian children because the children were not domiciled on the tribe's reservation.[74]  In *Holyfield*, the Supreme Court reversed, concluding that even though ICWA did not define "domicile," the term must be interpreted according to Congress's intent, not according to state law.[75]  The Court reasoned that the legislative history and

---

[71]     *See* 25 U.S.C. § 1902.

[72]     *See id.* §§ 1901, 1915.

[73]     *See generally* 490 U.S. 30 (1989).

[74]     *Id.* at 39-40.

[75]     *Id*. at 43, 47.

purpose of ICWA indicated Congress did not intend to leave the definition of a "critical term" to state courts, which Congress perceived as "partly responsible for the problem it intended to correct."[76] The Court also found it "beyond dispute that Congress intended a uniform federal law of domicile for the ICWA" because Congress "could hardly have intended the lack of nationwide uniformity that would result from state-law definitions of domicile."[77]

*Holyfield* instructs us that like the definition of "domicile," the "good cause" standard must be interpreted according to Congress's intent. While we are mindful that Congress intended to leave the good cause determination to the states, we recognize that this discretion is not without bounds. As our foregoing analysis of the purposes and policies that drove the enactment of ICWA indicates, the clear and convincing evidence standard is most consistent with Congress's intent to maintain Indian families and tribes intact wherever possible by eradicating the unwarranted removal of Indian children from their communities.

We also find *Holyfield*'s discussion of the need for nationwide uniformity pertinent to today's decision. As the South Dakota Supreme Court has observed, we are the only supreme court to apply the preponderance of the evidence burden of proof to findings of good cause to deviate from the ICWA adoptive placement preferences.[78] The South Dakota court held: "The 'clear and convincing' standard appears to be the better-

---

[76]     *Id*. at 45.

[77]     *Id*. at 44-47.

[78]     *In re D.W.*, 795 N.W.2d 39, 43-44 (S.D. 2011) (citing *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994)). As noted *supra* note 68, the Arizona Court of Appeals also applied the preponderance of the evidence standard in an unpublished decision. *See Robert T. v. Ariz. Dep't of Econ. Sec.*, No. 2 CA-JV 2010-0074, 2010 WL 5422605, at *3 (Ariz. App. Dec. 21, 2010).

reasoned approach. It is consistent with both the congressional intent in adopting ICWA and this Court's precedent."[79] The Minnesota and Oklahoma Courts of Appeals have similarly held that the clear and convincing standard applies to good cause determinations.[80] Given *Holyfield*'s emphasis on the need for uniformity, we find it persuasive that every other court to consider this matter in a published opinion has adopted the clear and convincing standard.

A clear and convincing standard of proof for § 1915(a) good cause determinations is also more consistent with other provisions in ICWA demanding a heightened standard of proof. Section 1921, for example, generally provides that state and federal courts should use the highest applicable standard of protection to protect parental rights in child custody proceedings.[81] Section 1912(e) also provides that foster care placements must be "supported by clear and convincing evidence . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child,"[82] and § 1912(f) requires that the termination of parental rights be "supported by evidence beyond a reasonable doubt . . . that continued custody of the child by the parent or Indian custodian is likely

---

[79]  *In re D.W.*, 795 N.W.2d at 44.

[80]  *See In re Custody of S.E.G.*, 507 N.W.2d 872, 878 (Minn. App. 1993); *In re Adoption of Baby Girl B.*, 67 P.3d 359, 373-74 (Okla. Civ. App. 2003) (determining that clear and convincing standard of proof applies to section 1915(b) determinations).

[81]  25 U.S.C. § 1921 (2006) provides: "In any case where State or Federal law applicable to a child custody proceeding . . . provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard."

[82]  *Id.* § 1912(e).

to result in serious emotional or physical damage to the child."[83]

Given Congress's intent, as evidenced by ICWA's legislative history, ICWA's stated policy, the Supreme Court's interpretation of ICWA, and other ICWA provisions,[84] we conclude that our prior decisions holding that the preponderance of the evidence standard applies to ICWA § 1915(a) good cause determinations were originally erroneous.

This does not end our analysis, however. Our stare decisis jurisprudence also requires a finding that more good than harm will result from overruling our prior holdings.[85] Here, this determination has already been made by Congress. In passing ICWA, Congress determined that federal standards were necessary to ensure that Indian children remain within Indian communities where possible.[86] Congress weighed the balance and concluded that more good than harm would come from a framework that allows deviation from this policy only where good cause exists. We now recognize that

---

[83]      *Id.* § 1912(f).

[84]      The Bureau of Indian Affairs ICWA Guidelines state that custody proceedings involving Indian children "shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to [ICWA placement] preferences," and that any ambiguities in ICWA statutes "shall be resolved in favor of a result that is most consistent with these preferences." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, at 67,586 (Nov. 26, 1979). Although these guidelines are not binding, they help inform our decision of whether ICWA mandates a "clear and convincing evidence" standard in adoptive preferences. *See Adoption of Keith M.W.*, 79 P.3d 623, 626 (Alaska 2003) ("Although the [BIA] guidelines are only persuasive and are neither exclusive nor binding, 'this court has looked to them for guidance.' " (quoting *In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993))).

[85]      *Kinegak v. State, Dep't of Corr.*, 129 P.3d 887, 889 (Alaska 2006).

[86]      *See House Report*, *supra* note 19, at 23, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

a heightened standard of proof is required to ensure that the good cause determination is made in accordance with this policy. Therefore, we conclude that more good than harm will result from overruling our prior holdings.

We recognize that today's decision may have negative implications. This case must be remanded for further proceedings, which will cause further delay to Dawn's permanency. Notwithstanding the seriousness of this concern, we are bound by the Supremacy Clause to follow congressional mandates.[87] We therefore hold that the portion of Adoption Rule 11(f) requiring the petitioner to show good cause "by a preponderance of the evidence" cannot stand in the face of ICWA.[88]

### 3. Application of the standard of proof

Because the superior court applied the preponderance of the evidence standard to this case rather than the clear and convincing standard, a remand is necessary so the superior court can determine whether there is good cause to deviate from the adoptive placement preferences under the heightened clear and convincing standard of proof. On remand, the superior court shall reopen the proceedings for new evidence since both the court and the parties were operating under the then-accurate belief that the preponderance of the evidence standard applied. On remand, OCS must prove by clear and convincing evidence that there is good cause to deviate from ICWA § 1915(a)'s adoptive placement preferences.

---

[87] U.S. CONST. art. VI.

[88] We note that none of the parties in this case have alleged that the superior court was biased or otherwise discriminated against Alaska Natives in its ruling, and we perceive only that the court was faithfully following our precedent, as it was required to do.

C.  **ICWA's Statutory Placement Preferences And The Good Cause Determination**

In addition to challenging the standard of proof that the superior court applied to its good cause determination, the Tribe challenges the substance of the court's rulings. The Tribe argues that the superior court erroneously concluded that there were no suitable statutory preferred placements and that there was good cause to deviate from the placement preferences. OCS responds that the superior court's findings are supported by sufficient evidence in the record and the court's ultimate ruling was not an abuse of discretion. Because we are remanding for further proceedings, we do not determine whether all of the superior court's findings were supported by the evidence. However, because aspects of the superior court's analysis were incorrect or incomplete, we find it necessary to lay out the proper analytical framework a court must follow in applying ICWA's placement preferences and in determining whether good cause exists.

ICWA establishes preferences that must be followed in an adoption placement with respect to an Indian child.[89] A court may deviate from these preferred placements only upon a showing of "good cause."[90] In *In re Adoption of Sara J.*, we made clear that "[a]lthough they are part of a common statutory scheme, inquiries into suitable preferred placements are separate from inquiries into good cause."[91] Thus, before determining whether good cause exists to deviate from the placement preferences, a court must first inquire as to whether any suitable preferred placements exist.

The "preferred placement" inquiry requires a court to apply the statutory framework and follow the tiered order of preference mandated by ICWA, i.e., give

---

[89]   25 U.S.C. § 1915(a) (2006).

[90]   *Id.*; *see In re Adoption of Sara J.*, 123 P.3d 1017, 1020 (Alaska 2005).

[91]   123 P.3d at 1023.

preference first to a member of the child's extended family, then to other members of the Indian child's tribe, and then to other Indian families.[92] This does not end the inquiry, however, as the court must also assess the suitability of each prospective placement if a party alleges that a preferred placement is unsuitable.[93] In other words, the court must determine not only that a placement is preferred, but also that the placement would be a suitable caretaker for the child.

We recognize that, although separate inquiries, the suitability and good cause determinations will often overlap and can rarely be considered independent of one another.[94]

We have established that, in assessing whether a prospective preferred placement is suitable, " 'white, middle-class standards' [shall] not be used . . . ."[95] Instead, ICWA § 1915(d) mandates that:

> The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.

---

[92]    25 U.S.C. § 1915(a).

[93]    *See generally In re Adoption of Sara J.*, 123 P.3d at 1021-22.

[94]    Because the parties did not raise or brief the issue, we do not decide what standard of proof should apply to the suitability determination. Although we discern no principled basis for adopting inconsistent standards of proof for the good cause determination and the suitability determination, particularly in light of our reasons for adopting a heightened standard of proof for the good cause determination, we leave this issue for the parties to brief and the superior court to address on remand if the issue arises.

[95]    *In re Adoption of Sara J.*, 123 P.3d at 1021 (quoting *House Report*, *supra* note 19, at 24, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546).

We have explained that these standards "do not override or change the preference requirements of § 1915" and "taken alone cannot provide for a different order of preference," but they may "support a conclusion that a higher-tier potential custodian is unsuitable, thus clearing the way for a lower-tier custodian."[96]

We have not had occasion to review in detail the factors a court may consider in its suitability analysis. In *In re Adoption of Sara J.*, we summarized the facts of *In re Jullian B.*, a case from the California Court of Appeal in which a social worker expressed concern about a potential placement's age, his inability to suggest a person who could care for the child if he became incapacitated, his criminal history, his health, and his lack of a support system.[97] We stated that these factors were "relevant to the suitability of the potential Native relative placement."[98] Again, we stressed that these factors must be "viewed in light of the prevailing social and cultural standards of the Indian community."[99]

If a court determines that a preferred placement is suitable, it must then turn to the good cause to deviate determination. We have explained that unlike the suitability determination, the prevailing social and cultural standards of the Indian community do not govern a court's good cause determination.[100] They do, however "remain relevant if the good cause inquiry raises questions about the suitability of a statutorily preferred

---

[96]    *Id.* at 1021-22.

[97]    *Id.* at 1026 (citing *In re Jullian B.*, 99 Cal. Rptr. 2d 241, 249-50 (Cal. App. 2000)).

[98]    *Id.*

[99]    *Id.*

[100]    *Id.* at 1020.

placement."[101] We have further held that the prevailing social and cultural standards "may also inform, but need not control," a court's consideration of other factors in its good cause analysis that do not implicate the suitability of a preferred placement.[102]

"ICWA does not define good cause, nor does it set forth factors to be considered in determining whether good cause exists."[103] The BIA guidelines provide that a good cause determination "shall be based on one or more" of three factors: (1) the preferences of the child or biological parents; (2) the child's extraordinary physical or emotional needs; and (3) the unavailability of suitable preferred placements after a diligent search for such placements has been conducted.[104] We have previously consulted these guidelines for guidance on appropriate factors to consider while noting that they "are only persuasive and are neither exclusive nor binding."[105] Rather, good

---

[101]    *Id*.

[102]    *Id*. at 1020, 1028 ("Courts should be sensitive to any differences in the circumstances that allow children to flourish in Native and non-Native communities. But courts need not ultimately apply the prevailing social and cultural standards of the Indian community in determining whether the resources available to an otherwise-suitable preferred placement are adequate to address the child's special needs.").

[103]    *C.L. v. P.C.S.*, 17 P.3d 769, 773 (Alaska 2001).

[104]    Guidelines for State Courts, 44 Fed. Reg. at 67,594; *see also Adoption of Keith M.W.*, 79 P.3d 623, 626 (Alaska 2003).

[105]    *Adoption of Keith M.W.*, 79 P.3d at 626; *see also Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994) ("The guidelines assist but do not bind this court."); *In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993) ("Although the Guidelines do not have binding effect, this court has looked to them for guidance." (citing *In re L.A.M.*, 727 P.2d 1057, 1060 n.6 (Alaska 1986))). The Tribe argues that the BIA guidelines reflect a general need to limit ICWA's good cause exception and cites decisions from other states that have held that the guidelines should be considered an exclusive list of the factors that a court may consider when making a good cause determination. We reiterate

(continued...)

cause to deviate "depends on many factors,"[106] including the child's best interests,[107] the child's symptoms of separation anxiety and attachment disorder,[108] the child's strong bond with the foster family and evidence the child would be harmed if that bond was broken,[109] the child's lack of a bond with a preferred placement,[110] the child's need for permanence,[111] and the ability to meet the child's emotional, physical, medical, cultural, or educational needs.[112] Among these factors, "the best interests of the child remain paramount."[113]

Here, the superior court considered the three BIA factors and found: (1) there was no evidence that Dawn had extraordinary special needs; (2) there was no testimony regarding the preferences of Dawn's biological parents; and (3) Elise was not a suitable placement for Dawn. The superior court also found that Dawn's best interests

---

[105](...continued)
our well-established rule that the BIA guidelines are neither binding nor exhaustive.

[106]    *In re Adoption of F.H.*, 851 P.2d at 1363-64.

[107]    *C.L.*, 17 P.3d at 773; *Adoption of N.P.S.*, 868 P.2d at 936; *In re Adoption of F.H.*, 851 P.2d at 1364.

[108]    *C.L.*, 17 P.3d at 774.

[109]    *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 430 (Alaska 2012); *In re Adoption of Bernard A.*, 77 P.3d 4, 8 (Alaska 2003); *C.L.*, 17 P.3d at 775; *In re Adoption of F.H.*, 851 P.2d at 1365.

[110]    *C.L.*, 17 P.3d at 773-75.

[111]    *In re Adoption of F.H.*, 851 P.2d at 1365.

[112]    *Paula E.*, 276 P.3d at 430; *In re Adoption of Sara J.*, 123 P.3d 1017, 1032-33 (Alaska 2005); *C.L.*, 17 P.3d at 775; *Adoption of N.P.S.*, 868 P.2d at 938.

[113]    *Adoption of N.P.S.*, 868 P.2d at 936; *see also C.L.*, 17 P.3d at 773 ("The best interests of the child remain the paramount criterion.").

compelled continued placement with the Smiths, based on: (1) the emotional trauma that Dawn would experience if moved from the Smiths, "particularly given the child's reactive attachment disorder symptoms"; (2) Dawn's need for permanence, and the fact that the adoption process with Elise would take approximately one year; and (3) Dawn's lack of a bond with Elise.

In finding good cause, the superior court did not rely on any factors we have not to some extent previously endorsed. Thus, all of the factors considered by the superior court were, generally speaking, appropriate factors to consider; but, for the reasons explained above, a remand is necessary because the superior court considered them under the improper standard of proof. On remand, the superior court must reconsider the factors it deems relevant under the heightened standard of proof.

A remand is also necessary because it appears the superior court failed to perform a separate suitability analysis distinct from its good cause analysis. The superior court analyzed suitability under a separate heading in its decision; the suitability analysis followed the good cause analysis. Importantly, the superior court explained: "There is little precedential guidance for this court on the factors that the court may consider in determining *whether or not there are suitable preference families in making the good cause determination* for variation from the ICWA placement preferences." (Emphasis added.) While it was appropriate for the superior court to consider the unavailability of suitable preferred placements within its good cause determination, the court was also required, as we have explained, to perform a separate suitability inquiry.[114]

The superior court also concluded that *In re Adoption of Sara J.*'s discussion of the applicability of the prevailing social and cultural standards of the Indian community to the suitability analysis was "dicta." It therefore erroneously analyzed

---

[114]     *In re Adoption of Sara J.*, 123 P.3d at 1023.

Elise's suitability without consulting the prevailing social and cultural standards of the Indian community. The superior court relied on Elise's age (67) and her husband's age (70) as compared to Dawn's age (3), evidence of Elise's husband's health problems, and Elise's lack of a credible contingency plan to ultimately reject Elise as a suitable placement, finding it unlikely that she could "keep up with and provide appropriate care for a three year old child," or that she and her husband would "both be alive for the minority of the child."

There are several problems with the superior court's analysis. First, although age may be a relevant factor for a court to consider in conjunction with an elderly placement's health problems or lack of a credible contingency plan, the court did not assess these factors in light of the prevailing social and cultural standards of the Indian community[115] even though the record was replete with evidence of these standards.[116] Had the court considered this unrebutted evidence, it would have found that it is socially and culturally customary that elderly Native people provide custodial care to very young children. We also note that even in a non-ICWA case, advanced age alone should not ordinarily be a determinative factor — even under "white, middle class

---

[115] *Id.* at 1021.

[116] The court heard considerable testimony from Village Council Presidents ICWA Director Oftt about the importance of family in Yup'ik culture and the role Yup'ik elders play in Yup'ik communities. Oftt also testified that the Tribe thought it was in Dawn's best interests to live in the village because "that would be with family and that would be within her Yup'ik culture." And when asked whether she had any concerns that Elise would be an unsuitable placement for Dawn because of her advanced age, Oftt responded no, because "[w]hen someone dies in the village, everyone pitches in and I have no doubt that someone would step forward to take over that [caretaker] role." Elise also testified that there was nothing unusual about grandparents raising a grandchild in the village.

standards"[117] it has been common in our country and in Alaska for elderly grandparents or relatives to assume care for very young children.

On remand the superior court must, in accordance with *In re Adoption of Sara J.*, consider the prevailing social and cultural standards of the Indian community in its determination of whether a prospective preferred placement is suitable before it reaches the good cause determination. We emphasize that a prospective placement's advanced age alone should not ordinarily be a determinative factor in finding that that placement is unsuitable. We also recognize that as time has passed, the facts and circumstances may have changed (both regarding suitable preferred placement factors and good cause to deviate factors). Accordingly, the parties may present new evidence, including expert testimony, on all relevant issues.

## V. CONCLUSION

ICWA requires that the "clear and convincing evidence" standard of proof applies to the 25 U.S.C. § 1915(a) good cause determination. Our precedents are overruled to the extent that they hold that the preponderance of the evidence standard applies to this determination. Because this case was decided under the preponderance of the evidence standard, and because the superior court's analysis of the issues of suitability and good cause was incorrect, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

[117] *See In re Adoption of Sara J.*, 123 P.3d at 1021 (citing *House Report*, *supra* note 19, at 24, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546).